Filed 2/7/14  P. v. Miller CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HERBERT CHARLES MILLER et al.,<br><br>    Defendants and Appellants. | B232167<br><br>(Los Angeles County<br>Super. Ct. No. TA112805) |

        APPEAL from judgments of the Superior Court of Los Angeles County,
David Sotelo, Judge.  Judgments are affirmed as modified.

        Joanna McKim, under appointment by the Court of Appeal, for Defendant and
Appellant Herbert Charles Miller.

        Gail Harper, under appointment by the Court of Appeal, for Defendant and
Appellant Javone Lamar Brown.

        Richard D. Miggins, under appointment by the Court of Appeal, for Defendant
and Appellant Jeffrey McLeod.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney
General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Mark E.
Weber, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants, Herbert Charles Miller, Javone Lamar Brown and Jeffrey McLeod appeal their convictions for two counts of first degree murder with multiple-murder special circumstance findings, and firearm use, criminal street gang, and prior serious felony conviction enhancements (Pen. Code, §§ 187, 190.2, subd. (a)(3), 12022.53, 186.22,subd. (b), 667, subds. (a) – (i)).[1] Defendants were sentenced to state prison for life without the possibility of parole.

The judgments are affirmed as modified.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

   a. *The Nutty Blocc Crip gang*.

The Nutty Blocc Crips[2] are one of the oldest street gangs in Compton. They originally referred to themselves as the Grandee Boys in reference to a local housing project known as "the Grandees." The Grandee Boys later joined the Crip gang organization under the auspices of Stanley "Tookie" Williams, and became known as the 165th or 166th Blocc Crips. They later changed their name to the "Nutty Blocc" Crip gang to signify they were the craziest gang in Compton.

The Nutty Blocc Crip gang consists of different sets or cliques based largely on age. At the top, and the most powerful, are Original Gangsters. Next in line are Original Baby Gangsters, followed by Baby Gangsters, Original Tiny Gangsters and then Tiny Gangsters. Defendants Herbert Charles Miller ("Hen" or "Baby Hen"), Javone Lamar Brown ("Bam") and Jeffrey McLeod ("J-Smash") and belonged to the Nutty Blocc Crips.

---

[1]     All further references are to the Penal Code unless otherwise specified.

[2]     Crip gang members spell the word "Block" as "Blocc" because in gang culture "[w]riting CK means  Crip Killer."

Brown and Miller were Baby Gangsters; McLeod was either an Original Tiny Gangster or a Tiny Gangster.

b. *The shooting of Nakia Wheeler and Michael Leggette.*

Nakia Wheeler lived at 1027 South Exmoor Avenue in Compton. He had grown up in the Exmoor neighborhood and people knew he was a marijuana dealer. Although Wheeler was not a gang member, he had never had any issues with the Nutty Blocc Crips before he was killed. Michael Leggette was Wheeler's friend. Los Angeles County Sheriff's Detective John Duncan, who worked in the gang unit, had nine years of experience dealing with the Nutty Blocc Crip gang. He had never encountered either Wheeler or Leggette, and he had no reason to believe Wheeler was a Nutty Blocc Crip gang member.

In the late afternoon on November 9, 2005, several teenage boys were standing on the 1100 block of South Exmoor Avenue, which was within Nutty Blocc Crip territory. A black Pontiac Grand Am with tinted rear windows drove slowly up and down the street, and then pulled up next to the teenagers. They could see two African American men in the car, the driver and a front seat passenger, but because of the tinted windows they could not see if anyone was in the back. The teenagers could not identify either the driver or the passenger with any certainty. The passenger asked if the teenagers were affiliated with a tagging crew. When they said no, someone in the car shouted "Nutty Blocc" or "This is Nutty Blocc Compton Crip," and the Pontiac drove off.

A few hours later, around 8:15 p.m., Nakia Wheeler pulled into his driveway in a red Ford Explorer. Michael Leggette was either in the vehicle with Wheeler or waiting for him in front of Wheeler's house.

A neighbor saw silhouettes on Wheeler's driveway and heard four or five people, including Wheeler, argue for two or three minutes. It sounded like "an angry confrontation." The neighbor then heard a gunshot, the sounds of someone running, and then more gunshots. The first gunshot was not as loud as the ones that followed. Other neighbors who heard the gunfire also testified the initial shot seemed to come from a less powerful weapon than the remaining shots.

3

A neighbor who lived on the 1100 block of Exmoor saw a dark Pontiac or Oldsmobile drive down his street around 5:00 or 6:00 p.m. Later that evening, the neighbor was inside his home when he heard gunshots. As he went to close his front door, he saw two people firing weapons while standing by this same car. The gunmen were near Wheeler's house. The neighbor saw Leggette running and the car drive away southbound on Exmoor after the shooting. This neighbor's brother also saw two people outside the car firing weapons. One of the teenagers who had seen the Pontiac Grand Am a few hours earlier saw the same car drive southbound on Exmoor right after the shootings.

Leggette was found lying unconscious on the front lawn of 1035 Exmoor. He died from a gunshot wound to the back. Wheeler was found face down on the ground in the back yard of 1026 Exmoor. He had been shot in the back, arm, and elbow. Wheeler, too, died from his wounds.

Wheeler's pants had been pulled down to mid-thigh. Two $5 bills and one $1 bill were found inside his pants. A single $5 bill was found on the front lawn of Wheeler's house. Wheeler's SUV was sitting in his driveway with the doors open and the keys in the ignition. The SUV reeked of marijuana, but no sizable amount of the drug was found inside the vehicle. No significant amount of money was found in or near the vehicle.

Five spent .45 caliber cartridge cases were found outside Wheeler's home, and two spent 7.62 by 39 millimeter rifle cartridge cases were found in the street. Ballistics tests showed two guns had been fired at the scene: a .45 caliber semiautomatic handgun and a semiautomatic rifle. A Ruger Mini 30 rifle is one of the weapons that typically fires a 7.62 by 39 millimeter bullet.

D.P. was about two blocks east of Exmoor when she heard the gunshots. Within minutes after the gunfire ended, defendants Brown and McLeod, along with an unidentified third man, ran past D.P. toward the Grandees housing project. This happened so soon after the gunfire that D.P. thought Brown and McLeod were the ones being shot at.

4

c. *In the aftermath of the shootings.*

The morning after the killings, D.P. overheard Brown and McLeod at the Grandees laughing and bragging to other Nutty Blocc Crip members about how "they hit a lick." D.P. testified a "lick" is a robbery. D.P. told police that Brown and McLeod said they had obtained a lot of money by robbing Wheeler.

D.P. was in the habit of buying marijuana from Wheeler on a daily basis. Wheeler sold a "good, light green stress weed" that came in "Chronic bags, the ones with [a] green Chronic symbol on it." A few days after the killings, Brown began selling marijuana just like the kind Wheeler used to sell D.P.[3] Before Wheeler was killed, Brown had not sold marijuana.

D.H. was born in Compton and became a Nutty Blocc Crip when he was 12 years old. He and McLeod had been friends for years. D.H. also knew Miller. D.H. had seen Miller with a black AK-47 rifle before the killings. Miller described the model as a "30-30." D.H. had once borrowed this gun from Miller. D.H. last saw this rifle in Miller's possession a few weeks before Leggette and Wheeler were killed. D.H. also saw a .45-caliber handgun in Brown's possession around the time Leggette and Wheeler were killed. The morning after the killings, McLeod told D.H. that he, Miller and Brown had robbed and killed Wheeler.

M.H.'s family began living in the Grandees neighborhood when she was 11 or 12 years old. Miller moved in next door. When M.H. was 14 years old, Miller began forcing her to have sex with him. He subsequently kidnapped her and forced her to have sex with other men who paid Miller for her services. Miller also physically abused M.H. Their relationship ended in December 2005 when the police rescued her from a Bellflower motel. During October-November 2005, M.H. saw Miller in possession of a handgun. He also kept guns in the trunk of his car and he would switch guns with

---

[3]    D.P. testified: "It was the same Chronic on the front [of the bag], fat sack and the same ingredients of the weed, like, the crunchy green."

5

McLeod.  A day or two after the killings, Miller instructed M.H. to tell Wheeler's mother that M.H. had seen "some Mexicans rob and shoot" her son.  When M.H. refused, Miller got angry.  A few minutes later, Brown told her "not to go over and get involved."

In 2005, Miller owned a black 1999 Pontiac Grand Am with tinted rear windows.  No one else in the neighborhood owned a car that looked like his car.  Three days after the killings he had the car painted gold.  In December 2005, Detective Cochran searched Miller's car, which had been impounded.  In the trunk he found two boxes of ammunition and a police scanner.  The ammunition was not the same caliber as any of the spent cartridges found at the crime scene.

S.T. was the girlfriend of a Nutty Blocc Crip gang member who was close to Brown.  The boyfriend and Brown shared an AK-47.  After the boyfriend was murdered in August 2005, Brown came to S.T.'s house every day to check on her and her children.  S.T. herself became an active Nutty Blocc Crip member in early 2006.  She committed a home invasion and 10 snatch-and-grab robberies with other Nutty Blocc Crip members.  Brown committed some of these robberies with her.  In March 2006, she and Brown began a sexual relationship that lasted until Brown was arrested and went to jail in April 2006.

In January 2006, Brown informed the Department of Corrections he was living in Long Beach with S.T., whom he pretended was his sister.  Brown told S.T. to make sure her house was "clean" because it "may be getting searched for a crime that they had committed."  Brown said he, McLeod and someone named J-Capone had shot and killed two people on Exmoor.  Brown said he had used an AK-47 weapon to shoot one victim and McLeod had shot the other.  Brown said they killed the victims for breaking into people's houses.

In September 2009, D.H. was transported from jail to the Compton courthouse in order to testify at defendants' preliminary hearing.  The defendants were put on the same bus and, during the ride, Miller told D.H. not to testify because "you know what happens to snitches."  Miller also spat on D.H.

6

While S.T. was waiting to testify in this case, Miller wrote letters urging her not to take the oath so the prosecutor could not use her police statements. Miller also gave her instructions on how to testify and said he believed she had already fulfilled her agreement with the District Attorney's Office about testifying. S.T. could tell the letters came from Miller because they contained details only he would know.

A few days before trial was originally scheduled to start, Miller began calling M.H. and leaving her unwanted voicemail messages. M.H. told Detective Cochran she thought Miller was possibly trying to dissuade her from testifying.[4]

d. *Expert testimony.*

Sheriff's Sergeant Frederick Reynolds testified as a gang expert. Committing violent crimes for a gang is referred to by gang members as "putting in work." A gang member typically commits crimes with other gang members. This gives the first gang member reassurance he will have support in committing the crime, and that he will have someone who can attest to fellow gang members he put in work for the gang. Gangs obtain money by committing robberies and selling drugs. A gang would want to control the sale of drugs within its territory.

Gaining other gang members' respect is important in gang culture. Committing an act of violence is one way to gain respect. The more violent a gang member is, the more respect he gains. A gang member who cooperates with the authorities risks being killed.

Detective Duncan testified as an expert on the Nutty Blocc Crips, whose primary activities included drug trafficking, robberies, shootings and murders. One reason for a gang to claim territory is in order to control whatever crime occurs within that area. A gang member's reputation is based on putting in work. Advising fellow gang members about the work one has done is a way to gain status. A Nutty Blocc Crip who lied about having put in work would risk a punishment ranging from being beaten to being killed.

---

[4] These recorded messages included one in which Miller is heard yelling, "[M.H.] man – what the fuck is the deal man . . . . [W]hats [*sic*] the deal – like we just have a lot to talk about . . . [Y]ou got a lot of little shit goin.' "

7

As a result, gang members generally tell the truth to fellow gang members and try to accurately account for the crimes they have committed. Duncan opined the Leggette-Wheeler killings had been committed to benefit the Nutty Blocc Crip gang. Killing a drug dealer who was operating within Nutty Blocc Crip territory without the gang's permission would show people that this behavior would not be tolerated. It also would give the perpetrators something to brag about.

2. *Defense evidence.*

a. *Brown's defense.*

Defense investigator Malcolm Richards determined D.P. had been standing about 95 feet from Brown and McLeod when she purportedly overhead them talking about the robbery.

Detective Duncan signed a statement in May 2006 declaring: "Confidential informants have been used in this case, but at this point the true motive for that cooperation is uncertain," and "Other known admitted gang members have admitted in the past certain facts in corroborated [*sic*] information obtained by investigators," but Duncan was "unaware of any of these individuals providing 100 percent truthful information." He also declared, "The motive for in-custody gang members . . . to provide information is obvious[,] they are cooperating for their own preservation."

b. *McLeod's defense.*

McLeod did not present any witnesses.

c. *Miller's defense.*

(1) *Miller's alibi witnesses.*

Miller presented an alibi defense, asserting that at the time Leggette and Wheeler were shot in Compton, he was receiving medical treatment in Lancaster.

Medical records from Lancaster Community Hospital (LCH) showed Miller had been treated for a gunshot wound in July 2003.

On November 9, 2005, Jacqueline Lord was working as an emergency-room nurse at LCH. At 9:21 p.m. that night, she conducted a triage assessment for a man complaining of abdominal pain. This man gave his name as Herbert Miller, but Lord

8

testified she did not recognize defendant Miller as the man she treated that night. On the assessment form, Lord recorded that the patient was 5 feet 6 inches tall and weighed 165 pounds. Miller, however, was 6 feet 2 inches and weighed about 200 pounds. The patient told Lord he had not had any prior surgeries and he did not mention having sustained a prior abdominal gunshot wound. Sometime before 1:24 a.m., the patient left the emergency room without having been seen by a doctor.

An LCH registration form had been submitted for a "Herbert Miller" at 9:55 p.m. on November 9, 2005. Handwriting on the form declared it had been filled out at 8:00 p.m. It can take 30 minutes or more to check in at the emergency room, depending on how busy the staff is. A blank LCH triage registration form could be obtained and filled out at any time prior to being submitted to the emergency room.

Miller's mother, Earline, lived in Lancaster. On November 9, 2005, around 6:00 or 6:30 p.m., Miller arrived at her home in pain and holding his stomach. Earline drove him to LCH in his black Grand Am. After waiting in the emergency room for a few hours she drove home, leaving Miller at the hospital. Earline then returned to LCH about 10:30 p.m. and brought Miller back to her house, where he spent the night.

Kurt Kuhn and Barbara Torres were handwriting experts. Kuhn was privately employed and Torres worked for the Sheriff's Department. They both examined the November 9, 2005, LCH emergency room forms. Kuhn opined it was highly probable, although not conclusive, that Miller had filled out one portion of the LCH registration form. Torres opined there was a strong likelihood Miller had filled out a hand-printed portion of the LCH registration form. However, neither Kuhn nor Torres could say *when* these forms had been filled out.

(2) *Miller's trial testimony.*

Miller testified he was born in Compton. When he was 15 or 16 his family moved to Nestor Avenue, about eight blocks from Exmoor. He joined the Nutty Blocc Crips in middle school, but did not participate in gang activities. Although Miller had been a Nutty Blocc Crip for 17 or 18 years, in all that time he had never put in any work for the gang.

9

Miller testified he stopped associating with the gang in June 2005 because he "went to church" and "wanted to be . . . social for God." In November 2005, when the killings occurred, he was not associating with any Nutty Blocc Crip gang members because his life "was already . . . given over to Christ." He got the large Nutty Blocc Crip tattoo on his chest in 2008 because of his "love for that neighborhood," not because he was identifying himself as a member of the gang.

Miller knew Brown was in the Nutty Blocc Crips. He and Brown were on bad terms and they stayed away from each other. Miller did not know McLeod personally, just from around the neighborhood. Miller had known Wheeler since grade school and they remained friends. Wheeler was accepted by Nutty Blocc Crip gang members and he socialized with them at picnics and parties.

On the day Leggette and Wheeler were killed, Miller dropped his stepchildren off at school in the morning and then drove to Long Beach Community College, where he stayed until 5:00 p.m. From Long Beach he drove to Lancaster, where his daughter lived with her mother. But Miller was not supposed to visit unannounced, so he went to his parents' house instead. When he began having abdominal pains, his mother drove him to LCH. At about 8:00 p.m., he filled out various hospital forms. He met with nurse Lord and told her he had stomach pains, although he really had herpes. He did not tell Lord about the herpes because he wanted to talk to a doctor.[5] He lied when he told Lord he had not had prior surgeries because it was beside the point; he just wanted attention for his abdominal pains.

Miller waited until midnight without seeing a doctor and then left the hospital because his pain had subsided. He called his mother, who picked him up and brought him back to her house where he spent the night. He left the next morning at 6:00 a.m. and returned to his apartment in Compton. His girlfriend was there when he arrived.

---

**5**    Miller testified: "I didn't want her to know what it was. I was in a white hospital. I didn't want people to know my business."

10

Later that day, Miller learned Leggette and Wheeler had been killed the night before. When he heard people were saying his car had been used in the killings, he was concerned because he knew that couldn't be true. He was also concerned that his girlfriend and her children, who lived with him, might be in danger because of the rumors.

In November 2005, Miller owned a black, two-door 1999 Pontiac Grand Am. He did not know of anyone else in the neighborhood who had a car like his at that time. He had the car painted on November 12 because of the rumors connecting it to the Leggette-Wheeler killings.

Miller wanted Wheeler's mother to know he had not killed her son, but people said it was not a good idea for him to approach her. He denied having instructed M.H. to tell Wheeler's mother that some Mexicans had killed her son. Rather, Miller was trying to get M.H.'s opinion about whether he should approach Wheeler's mother, and it was M.H.'s own idea to contact Wheeler's mother herself.

Miller testified the ammunition and police scanner Detective Cochran found in his car did not belong to him. He denied having accosted D.H. on the bus ride to the preliminary hearing; he did not speak to D.H., threaten him or spit on him, and nobody else did either. He wrote one letter to S.T. because it was the five-year anniversary of her boyfriend's death and Miller had been thinking about him. Miller never contacted S.T. about this case and no one did so on his behalf.

Miller denied having had sex with M.H. The photographs of her found on the computer in the Bellflower motel did not belong to him. In truth, M.H.'s father had been paying her for sex and that's why she did not want to go home.

3. *Prosecution's rebuttal evidence.*

Detective Cochran interviewed Miller twice and both interviews were recorded. Cochran was accompanied by his partner, who was a woman. Miller told them his medical reason for going to the hospital involved his penis. He was not shy about discussing this and even offered to show them his penis.

11

Sheriff's Lieutenant Elizer Vega stopped Miller for a traffic violation on December 6, 2005. Miller was driving a gold Grand Am. Vega drove Miller to a motel in Bellflower where Vega found a 14-year-old girl in one of the rooms. There was a box of condoms in the room. As the officers were escorting the girl from the motel, Miller yelled: "Don't say nothing."

Sheriff's Sergeant David Brossoit oversaw the day-to-day movement of prisoners to and from jails, prisons and courts. He testified Deputies Uriostegui and Voorhees transported D.H. and the defendants from jail to the Compton courthouse on September 15, 2009. D.H. was the first prisoner to get on the bus; Brown boarded a minute later, and then McLeod and Miller five minutes after Brown.

4. *Miller's surrebuttal evidence*.

Sheriff's Deputy Kevin Uriostegui drove the bus that transported D.H. and the defendants from jail to the preliminary hearing. He did not recall any unusual incidents that day, and no threats or assaults had been reported to him. However, it would have been possible for a general-population prisoner to spit on a prisoner sitting in one of the keep-away cages on the bus.

Sheriff's Deputy Noel Voorhees was the security officer on the bus that transported D.H. and defendants from jail to the preliminary hearing. Voorhees did not recall any unusual incidents that day. No one reported to him about having been threatened or spat on. However, it can be noisy on the bus and the deputies have no way of knowing everything that goes on.

Miller testified he got the large "Nutty Blocc Crip" tattoo on his chest in 2010, less than two months before the trial. On cross-examination, he denied having testified earlier that he got the tattoo two years ago in 2008.

Miller testified he signed his name differently at different times because no one had ever told him it was important to be consistent.

12

**CONTENTIONS**

1. There was insufficient evidence to sustain defendants' murder convictions.

2. There was insufficient evidence to support the multiple-murder special circumstance finding against Miller.

3. Brown was the victim of vindictive prosecution.

4. The trial court erred by not bifurcating the gang enhancement allegations.

5. The trial court committed misconduct by making improper comments during voir dire.

6. The trial court erred by admitting defendants' extra-judicial statements.

7. The trial court erred by admitting consciousness of guilt evidence relating to Wheeler's mother.

8. The trial court erred by admitting evidence about Miller's relationship with M.H.

9. The trial court erred by admitting evidence Miller tried to intimidate a prosecution witness.

10. The trial court erred by excluding evidence a prosecution witness had committed an unrelated murder.

, 11. The trial court erred by not compelling a prosecution witness to identify another potential witness.

12. The trial court erred by allowing a prosecution witness to testify while wearing sunglasses.

13. The trial court erred by admitting evidence about the possession of certain guns and ammunition.

14. There was prosecutorial misconduct.

15. Defendants were entitled to a voluntary manslaughter instruction.

16. There was cumulative error.

17. Miller was entitled to have counsel reappointed after his post-conviction decision to represent himself.

18. There were various sentencing errors.

13

## DISCUSSION

1. *There was sufficient evidence to sustain defendants' murder convictions.*

Defendants contend their murder convictions must be reversed for lack of sufficient evidence. They contend there was insufficient evidence to prove their involvement in the killings or, if they had been involved, that they had committed first degree murder. These claims are meritless.

a. *Legal principles.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

The reviewing court is to presume the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Ochoa, supra,* 6 Cal.4th at p. 1206.) Even if the reviewing court believes the circumstantial evidence might be reasonably

14

reconciled with the defendant's innocence, this alone does not warrant interference with the trier of fact's verdict. (*People v. Towler* (1982) 31 Cal.3d 105, 118.) It does not matter that contrary inferences could have been reasonably derived from the evidence. As our Supreme Court said in *People v. Rodriguez, supra,* 20 Cal.4th 1, while reversing an insufficient evidence finding because the reviewing court had rejected contrary, but equally logical, inferences the jury might have drawn: "The [Court of Appeal] majority's reasoning . . . amounted to nothing more than a different weighing of the evidence, one the jury might well have considered and rejected. The Attorney General's inferences from the evidence were *no more inherently speculative* than the majority's; consequently, the majority erred in substituting its own assessment of the evidence for that of the jury." (*Id*. at p. 12, italics added.)

"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) "[I]n general neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission. [Citations.] However, '[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

> b. *Discussion*.

> (1) *Evidence of defendants' involvement in the killings.*

Several incriminating admissions showed the defendants had been involved in the killings. The day after the killings, D.P. overheard McLeod and Brown laughing and bragging about having robbed Wheeler. That same day, McLeod told D.H. that all three defendants had robbed and killed Wheeler. Within a few months of the killings, Brown told S.T. that he and McLeod had shot and killed two people on Exmoor and that he had used an AK-47 to shoot one of the victims.

15

The evidence tended to show Miller had been driving the car. He owned a black Pontiac Grand Am with tinted rear windows and he acknowledged nobody else in the neighborhood owned a car like his in November 2005. A black Pontiac Grand Am with tinted rear windows was seen going down Exmoor, where Wheeler lived, a few hours before the killings. Someone in the car called out Nutty Blocc Crip gang slogans and then the car drove off. The car returned to Exmoor a few hours later and the two gunmen stood by the car while shooting the victims. The car drove away immediately after the shooting stopped. A day or two after the killings, Miller instructed M.H. to tell Wheeler's mother her son had been killed by "some Mexicans." Three days after the killings, Miller had his car painted gold.

The evidence tended to show Brown and McLeod had been the gunmen. Just after the gunfire stopped, they were seen running from the shooting scene toward the Nutty Blocc Crips' hangout in the Grandees housing project. Their flight occurred so close in time to the gunfire that a witness thought Brown and McLeod were the ones being shot at. Within days of the killings Brown, who had not previously sold marijuana, began selling a product that was similar to, and had the same packaging as, the marijuana Wheeler had been selling.

Defendants either possessed or had access to the kinds of guns used in the killings. One had been a .45 caliber handgun and the other was a semiautomatic rifle, most likely a Ruger Mini 30. Miller possessed a semiautomatic rifle he described as a "30-30," and D.H. had seen that rifle in Miller's possession a few weeks before the killings. Brown had access to an AK-47 semiautomatic rifle, and he told S.T. he had used an AK-47 rifle to kill one of the victims. Brown possessed a .45 caliber handgun and D.H. saw this weapon in Brown's possession around the time of the killings.

There was evidence Miller wrote to S.T., trying to convince her not to testify against him. Miller began calling M.H. just before the trial was scheduled to start and left messages she interpreted as urging her not to testify. There was evidence Miller and his mother gave false testimony at trial in order to provide him with an alibi. The evidence tended to show Miller had prepared this false alibi in anticipation of carrying

16

out the killings by filling out portions of the LCH emergency room forms prior to November 9, 2005, so he would have an alibi for when he was driving Brown and McLeod to the crime scene.

In sum, there was ample evidence the defendants had been involved in the killings.

(2) *Evidence of first degree murder.*

The trial court instructed the jury on two theories of first degree murder, premeditated murder and robbery felony murder, as well as on the principles of aiding and abetting liability. There was sufficient evidence to support either theory and the jurors did not have to agree on which one was correct. "[W]here the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty. [Citation.]" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) If the jury believed the defendants had been motivated by a desire to punish the victims for breaking into people's homes, or a desire to punish Wheeler's drug dealing, then it was reasonable to rely on a premeditation and deliberation theory. If the jury believed defendants had been motivated by a desire to commit robbery, then it was reasonable to rely on a felony murder theory.

(a) *Evidence of premeditation and deliberation.*

The various types of premeditation and deliberation evidence have been described as follows: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing – what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere

17

unconsidered or rash impulse hastily executed' [Citation.]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)

The evidence showed several motives for the killings. Detective Duncan testified one reason gangs claim territory is to control whatever crime occurs in that area. The trial evidence suggested the defendants killed Leggette and Wheeler to punish them for breaking into people's homes. In addition, Sergeant Reynolds's testimony that a gang would want to control the sale of drugs within its territory suggested the defendants could have been motivated to kill Wheeler for selling drugs in their territory. In this scenario, Leggette could have been killed either because the defendants thought he was selling drugs with Wheeler, or to get rid of an eyewitness to Wheeler's killing.

There was evidence of planning activity because the defendants brought loaded guns to the crime scene. (See, e.g., *People v. Miranda* (1987) 44 Cal.3d 57, 87, disapproved on other grounds by *People v. Marshall* (1990) 50 Cal.3d 907 ["that defendant brought his loaded gun into the store and shortly thereafter used it to kill an unarmed victim reasonably suggests that defendant considered the possibility of murder in advance"]; *People v. Alcala* (1984) 36 Cal.3d 604, 626, superseded by statute on other grounds as stated in *People v. Falsetta* (1999) 21 Cal.4th 903, 911 ["when one . . . brings along a deadly weapon which he subsequently employs, it is reasonable to infer that he considered the possibility of homicide from the outset"].)

There was also manner-of-killing evidence tending to show premeditation and deliberation because this was essentially a drive-by shooting in which the unarmed victims were shot in the back. (See *People v. Silva* (2001) 25 Cal.4th 345, 369 ["The

18

manner of killing – multiple shotgun wounds inflicted on an unarmed and defenseless victim who posed no threat to defendant – is entirely consistent with a premeditated and deliberate murder."]; *People v. Vorise* (1999) 72 Cal.App.4th 312, 318-319 [premeditation and deliberation established where evidence showed defendant calmly shot incapacitated victim in chest twice at close range].)

(b) *Evidence of felony murder.*

There was also substantial evidence defendants killed Leggette and Wheeler in the course of robbing Wheeler. McLeod and Brown openly bragged to fellow gang members that they had robbed Wheeler. Evidence at the crime scene tended to show Wheeler had been robbed of both money and marijuana. Despite his occupation as a drug dealer, no significant amount of money was found on him although a single $5 bill was found on the lawn in front of his house. This raised a reasonable inference that defendants robbed Wheeler and accidentally dropped a $5 bill in the process. Although Wheeler's SUV reeked of marijuana, no sizable amount of the drug was found either inside the vehicle or in the possession of either Leggette or Wheeler. Brown had not sold marijuana before the killings, but a few days later he began selling marijuana having a similar quality and packaging to the marijuana Wheeler had been selling. Even if Leggette were just an inconvenient bystander-witness, he too was a felony murder victim. (See, e.g., *People v. Young* (1992) 11 Cal.App.4th 1299, 1308 [felony murder properly applied where bystander killed during defendant's reckless high-speed flight in stolen vehicle after carjacking].)

(3) *Defendants' counter-arguments are meritless.*

Brown and McLeod complain the prosecution witnesses consisted of unreliable gang members, drug users and convicted felons, and they claim that even the trial court concluded these witnesses lacked credibility. Brown asserts the "trial court admitted the snitch witnesses were 'thoroughly impeached,' meaning they were liars who could not be believed." But this assertion misrepresents the record by taking the trial court's remarks out of context. The court's remarks occurred in the course of denying defendants' motion for a new trial, when the trial court pointed out the defendants had tried to

19

impeach the prosecution witnesses but that the jury had obviously rejected their attempt: "[U]ltimately the conviction in this case substantially is based on the testimony of . . . three witnesses who are former . . . members of the same criminal street gang who were privy to the world and the culture [of] each defendant . . . . Each of whom [was] thoroughly impeached and scrutinized on behalf of the accused in the presence of the jury. [¶] *The motion for new trial on that basis is denied*." (Italics added.)

Brown argues D.P. lied about buying marijuana from him after Wheeler died: "The problem is that [D.P.] changed her testimony on cross to an admission that she had *not* bought marijuana from Brown or seen anyone buying marijuana from Brown, but that her unnamed 'roommate' had purchased marijuana from Brown and brought it back to her. This is not 'evidence' – this is unreliable hearsay lacking any foundation." There was, however, no objection to the implied hearsay in D.P.'s testimony, i.e., that her roommate purchased the marijuana from Brown and then told D.P. where she got it, and unobjected-to hearsay testimony constitutes evidence. (See Evid. Code, § 353; *People v. Rodriquez* (1969) 274 Cal.App.2d 770, 776 ["hearsay evidence is competent and relevant in the absence of a specific hearsay objection"]; *McVey v. McVey* (1955) 132 Cal.App.2d 120, 123 [unobjected-to hearsay statements "became competent evidence"].) In any event, as discussed *post*, D.P. later clarified her testimony and said she had indeed purchased marijuana directly from Brown.

The evidence was sufficient to support defendants' first degree murder convictions.

2. *Sufficient evidence of Miller's multiple-murder special circumstance finding.*

Miller contends his multiple-murder special-circumstance finding must be reversed for insufficient evidence. This claim is meritless.

When a defendant challenges the sufficiency of the evidence supporting a jury's special-circumstance finding, the standard of review is the same as when a reviewing court examines the sufficiency of the evidence supporting a conviction. (*People v. Booker* (2011) 51 Cal.4th 141, 172.)

20

Section 190.2, subdivision (a)(3), provides for a sentence of life without the possibility of parole when the defendant is convicted in one proceeding of having committed a first degree murder and at least one other first or second degree murder. Section 190.2, subdivision (c), requires that an aider and abettor who is not the actual killer must have acted with the intent to kill. (*People v. Souza* (2012) 54 Cal.4th 90, 110, fn. 6 [for an aider and abettor who did not actually kill the victims, multiple murder special circumstance requires an additional finding of intent to kill].)

Miller argues that, in finding him guilty of first degree murder, "the jury necessarily based its verdict on a felony-murder aiding and abetting theory, the murders [having] occurred during a robbery." But, as discussed *ante*, there was sufficient evidence to sustain Miller's conviction for premeditated and deliberate murder. The trial court instructed the jurors they could find the multiple-murder special circumstance allegation true, as to a defendant who did not actually kill either victim, only if they found the defendant acted with intent to kill. Miller does not challenge the correctness of the trial court's instructions. Since the properly instructed jury found his multiple murder special circumstance allegation true, it must have concluded Miller was guilty of a premeditated and deliberate killing rather than just an accidental killing.

There was sufficient evidence to sustain Miller's multiple murder special circumstance finding.

3. *Brown was not the victim of vindictive prosecution.*

Brown contends the trial court erred by refusing to dismiss the charges against him on the ground of vindictive prosecution. This claim is meritless.

a. *Background.*

In December 2006, Brown was charged with one count of murder and three counts of attempted murder in connection with two shootings that were unrelated to the killings of Leggette and Wheeler. In 2008, Brown, McLeod and a codefendant, Robert Neal, went on trial for these shootings in *People v. Neal*, Los Angeles County Superior Court Case No. TA093812 (*Neal*). The jury acquitted the defendants on two of the attempted

21

murder charges, but could not reach a verdict on the murder charge and on one of the attempted murder charges. A retrial on these counts was held in March 2009.

On March 20, 2009, S.T. entered into a formal agreement with prosecutors to testify about the Leggette-Wheeler killings, for which Miller, Brown and McLeod were then charged in April 2009, at which point the *Neal* retrial was still going on. Brown was acquitted in the *Neal* retrial shortly thereafter.

In June 2010, Brown moved to dismiss the charges against him in the case at bar on the ground of vindictive prosecution. He alleged: "Despite having practically the same information now as it did in the early stages of the investigation of the charged crimes, the prosecutor's office chose not to file the instant case until [the *Neal* case] . . . was obviously falling apart . . . and he would be released after the verdict." The trial court denied the motion, finding no hint of any retaliatory motive and, therefore, no presumption of vindictiveness. The court also found that, in any event, a change in circumstances rebutted any such presumption because of S.T.'s recent agreement to testify in this case.

b. *Legal principles.*

The constitutional protection against prosecutorial vindictiveness is based on the notion that it "would be patently unconstitutional" to "chill the assertion of constitutional rights by penalizing those who choose to exercise them." *(United States v. Jackson* (1968) 390 U.S. 570, 581 [88 S.Ct. 1209].) "[T]he presumption of unconstitutional vindictiveness is a legal presumption which arises when the prosecutor increases the criminal charge against a defendant under circumstances which . . . are deemed to present a 'reasonable likelihood of vindictiveness.' The presumption is not based on the subjective state of mind of the individual prosecutor and does not imply that he or she individually harbors an improper motive. [¶] By the same token this legal presumption cannot be rebutted by the prosecutor's declaration that he or she was motivated by a reassessment of the evidence against the defendant rather than by any desire to punish the exercise of a protected right. In order to rebut the presumption of vindictiveness, the prosecution must demonstrate that (1) the increase in charge was justified by some

22

objective change in circumstances or in the state of the evidence which legitimately influenced the charging process and (2) that the new information could not reasonably have been discovered at the time the prosecution exercised its discretion to bring the original charge." (*In re Bower* (1985) 38 Cal.3d 865, 879.)

Vindictive prosecution can occur when a prosecutor increases the charges against a defendant who has exercised a constitutional procedural right, such as successfully appealing a conviction (*North Carolina v. Pearce* (1969) 395 U.S. 711 [89 S.Ct. 2072]) or exercising a statutory right to a trial de novo after sustaining a misdemeanor conviction (*Blackledge v. Perry* (1974) 417 U.S. 21 [94 S.Ct. 2098]). "Where the defendant shows that the prosecution has increased the charges *in apparent response to the defendant's exercise of a procedural right*, the defendant has made an initial showing of an appearance of vindictiveness. [Citation.]" (*Twiggs v. Superior Court* (1983) 34 Cal.3d 360, 371, italics added.) "Given the severity of such a presumption however – which may operate in the absence of any proof of an improper motive and thus may block a legitimate response to criminal conduct – the Court has done so only in cases in which a reasonable likelihood of vindictiveness exists." (*United States v. Goodwin* (1982) 457 U.S. 368, 373 [102 S.Ct. 2485].) Where there is no such reasonable likelihood, "the burden remains upon the defendant to prove actual vindictiveness." (*Alabama v. Smith* (1989) 490 U.S. 794, 799-800 [109 S.Ct. 2201].)

"It is well established . . . that a district attorney's enforcement authority includes the discretion either to prosecute or to decline to prosecute an individual when there is probable cause to believe he has committed a crime." (*Davis v. Municipal Court* (1988) 46 Cal.3d 64, 77.) "The decision as to appropriate charges is a matter of prosecutorial discretion. '[P]rosecutorial discretion is basic to the framework of the California criminal justice system. [Citations.] This discretion, though recognized by statute in California, is founded upon constitutional principles of separation of powers and due process of law.' [Citation.] We refuse to require prosecutors to proceed against a defendant on all known charges simultaneously. We share the concern . . . that such a requirement 'would tend to aggravate the very harassment it was designed to alleviate by impelling a prosecutor

filing on one charge to throw the book at the defendant in order to prevent him from acquiring immunity against other potential charges and to protect the prosecutor from accusations of neglect of duty.' [Citation.] Rather, we adhere to the rule of *Kellett*: 'When . . . the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part, all such offenses must be prosecuted in a single proceeding unless joinder is prohibited or severance permitted for good cause. Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence.' [*Kellett* [*v. Superior Court of Sacramento County* (1966)] 63 Cal.2d [822,] 827 . . .].)" (*People v. Valli* (2010) 187 Cal.App.4th 786, 801.)

   c. *Discussion.*

  Brown does not claim he was the victim of actual vindictiveness on the part of the prosecution. (See, e.g., *United States v. Ladeau* (6th Cir. 2013) 734 F.3d 561, 566 [actual vindictiveness is " 'objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights' "].) Although his opening brief contains a section with the heading "Brown Demonstrated Actual Vindictiveness," that section merely cites case law without making any factual assertions related to Brown's case. The failure to properly develop an argument is fatal on appeal. (See *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 ["Issues do not have a life of their own: if they are not raised or supported by argument or citation to authority, we consider the issues waived."].)

  Instead, Brown argues only that the prosecution failed to rebut a presumption of vindictiveness. He asserts "the timing of the charges in this case indicates Brown was charged for the murders as retaliation for Brown's exercise of his constitutional and statutory right to a jury trial in case number TA093812 and winning that case." We disagree.

  Brown does not contend the charges in *Neal* were related to the charges in this case. This is not a situation that gives rise to a presumption of vindictiveness. (See *People v. Lucious* (1984) 153 Cal.App.3d 416, 420-424 [filing additional charges in

same case for unrelated conduct was not vindictive]; *People v. Kun Lee* (Ill. App. Ct. 2011) 954 N.E.2d 338, 346 [reindicting defendant on unrelated charge after successful appeal of convictions in different case was not vindictive]; *Williams v. Bartow* (7th Cir. 2007) 481 F.3d 492, 501-504 [adding new charges for unrelated conduct after defendant won motion for new trial was not vindictive]; *Humphrey v. United States* (11th Cir. 1989) 888 F.2d 1546, 1549 [indicting defendant on unrelated charges while he was seeking appellate and collateral relief from first conviction was not vindictive]; *United States v. Martinez* (9th Cir. 1986) 785 F.2d 663, 668-670 [indicting defendant on unrelated charges in one case after he was acquitted in different case was not vindictive].)  The only common bond with *Neal* was that in both cases Brown and McLeod were defendants and S.T. was a witness.  That did not give rise to a presumption of vindictiveness. (See *id*. at pp. 669-670 [fact that two cases against defendant shared witnesses was "of no import"].)

Brown's reliance on *United States v. Groves* (9th Cir. 1978) 571 F.2d 450, is misplaced because there, the charges in the second prosecution were factually related to the charges in the first prosecution.  The police found cocaine in the defendant's wallet when they arrested him for participating in a marijuana smuggling operation and, therefore, "the two statutory violations were so interrelated that there would never have been a cocaine charge in the first instance were it not for the marihuana [*sic*] investigation.  Both crimes, in short, grew out of the same set of facts"  (*Id.* at p. 454.) Brown also mistakenly relies on *United States v. Jenkins* (9th Cir. 2007) 504 F.3d 694. Jenkins testified during her drug-smuggling trial that she believed she had been smuggling illegal aliens, not drugs.  Although the government had sufficient evidence to prosecute Jenkins for alien-smuggling before she admitted those crimes on the stand, it went ahead with the prosecution only after Jenkins exercised her right to testify.

Hence, there was no presumption of vindictiveness in this case.

Moreover, there was evidence S.T.'s March 2009 agreement to testify about Brown's statement, which incriminated McLeod and himself in the Leggette-Wheeler killings, triggered the prosecutor's decision to file charges in this case.  The trial court

25

concluded S.T.'s agreement to testify in this case was a new fact justifying the decision to charge defendants and would have effectively rebutted any presumption of vindictiveness.

    4. *Trial court properly refused to bifurcate gang enhancement allegation.*

Defendants contend the trial court erred by not bifurcating trial of the criminal street gang enhancement allegation. This claim is meritless.

    a. *Legal principles.*

A trial court's decision not to bifurcate trial of a gang-enhancement allegation is reviewed for abuse of discretion. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048.)

The admission of gang evidence always carries a risk of prejudice. "When offered by the prosecution, we have condemned the introduction of evidence of gang membership if only tangentially relevant, given its highly inflammatory impact." (*People v. Cox* (1991) 53 Cal.3d 618, 660, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) However, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation – including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like – can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez, supra,* 33 Cal.4th at p. 1049; see also *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369 ["[e]vidence of gang activity and affiliation is admissible where it is relevant to issues of motive and intent"]; *People v. Avitia* (2005) 127 Cal.App.4th 185, 192 ["Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative."].)

Gang evidence is particularly relevant where it serves to explain an otherwise inexplicable crime. (See *People v. Ruiz* (1998) 62 Cal.App.4th 234, 239 [notwithstanding potential prejudicial effect of gang evidence, such evidence is admissible "when the very reason for the crime is gang related"]; *People v. Martin* (1994)

23 Cal.App.4th 76, 81 ["where evidence of gang activity or membership is important to the motive, it can be introduced even if prejudicial"].)  Gang evidence can also be relevant to the evaluation of a witness' credibility.  " ' "Evidence a witness is afraid to testify is relevant to the credibility of that witness and is therefore admissible. [Citations.]  Testimony a witness is fearful of retaliation similarly relates to that witness's credibility and is also admissible.  [Citation.]  It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible.  [Citation.]" [Citation.]' "  (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449-1450.)

        b.  *Discussion*.

The trial court denied a motion to bifurcate the gang-enhancement allegations after concluding the gang evidence was more probative than prejudicial.  Indeed, the court said it was "so intrinsically entwined I can't imagine keeping it out."  We agree.

The main issues at trial were identity, motive and intent, and the gang evidence was directly relevant to these issues.  It explained why the defendants committed these crimes.  It explained why the defendants committed these crimes with each other, particularly in light of Miller's claim he did not get along with Brown and barely knew McLeod.  (See, e.g., *Hernandez*, *supra*, 33 Cal.4th at p. 1051 [gang evidence served to explain why members of two gangs would commit crimes together].)  It explained why McLeod confided in D.H. about his role in the crimes, and why Brown did the same with S.T.

Evidence about the black Grand Am cruising Exmoor Avenue a few hours before the killings, and someone in the car shouting out a gang slogan, was relevant to show this car was connected to the Nutty Blocc Crips gang because evidence showed the same car had been used in the killings.  Evidence that Miller was a Nutty Blocc Crip member and owned the Grand Am was relevant to prove his identity as one of the perpetrators.

Immediately following the shootings, Brown and McLeod were seen running to the Grandees apartment complex, which evidence showed was the main hangout of the Nutty Blocc Crips gang.  The next day, Brown and McLeod were overheard bragging to

27

fellow Nutty Blocc Crip gang members about having committed a robbery the night before. Gang evidence was relevant to explain why Brown and McLeod ran to the Grandees, why they were bragging about the crimes the next day, and why they were unlikely to have lied to fellow gang members about their involvement.

Detective Duncan testified one reason gangs claim territory is to exercise control over whatever crime occurs in that area. Hence, the gang evidence tended to show the defendants had been motivated to kill Leggette and Wheeler for breaking into people's homes, as Brown told S.T. In addition, Sergeant Reynolds's testimony that a gang would want to control the sale of drugs within its territory suggested the defendants could also have been motivated by the fact Wheeler was openly selling drugs.

Gang evidence was relevant to explain D.H.'s relationship with the defendants, especially with McLeod, and his knowledge that defendants possessed the kind of guns used in the killings. The same was true of S.T., especially concerning her relationship with Brown. Evidence about gang loyalty and retaliation against snitches was relevant to explain why witnesses like D.H. and S.T. had not come forward earlier than they did, and why their testimony sometimes differed in crucial respects from their police statements.

The trial court did not abuse its discretion by refusing to grant bifurcation because the gang evidence was relevant to prove the defendants' identities, motive and intent, and to explain their relationships with each other and with the various witnesses.

5. *Trial court did not commit misconduct during voir dire.*

During jury selection, the trial court and counsel discussed with prospective jurors the importance of deciding the case based on the evidence, not on the physical appearances of the defendants or the witnesses. As part of this discussion, the trial court showed prospective jurors a photograph of the notorious serial killer Ted Bundy in order to stress the importance of not judging people based on their looks. Defendants contend this constituted reversible error. This claim is meritless.

28

a. *Background*.

During this voir dire discussion about treating the defendants fairly, the trial court related a personal story: "[S]ometimes jurors come up with all sorts of reasons to make it easier for the prosecutor. They'll look at someone and they'll say, well, that person looks guilty. I actually heard jurors say that. I was one time on jury duty. . . . And walking out during the break and one juror turned to the other and said, 'Did you see the defendant? He looked so guilty.' And I remember how remarkable that was . . . I imagine that juror was going to make it easier for the prosecutor to prove the case because in her opinion somebody looked guilty. In other words, this person was judging . . . a book by its cover. [¶] And so when we think of these images, what looks guilty, we think about . . . Richard Ramirez or Charles Manson with a swastika on his forehead. . . . [¶] . . . [Y]ou saw Mr. Miller, Mr. Brown and McLeod. Have any of you concluded . . . that they automatically look guilty because of what they look like? The color of their skin, the shape of their heads. Anybody? That is just as unreasonable as saying somebody is automatically guilty because they're associated with a street gang. There has to be evidence, ladies and gentlemen, beyond a reasonable doubt.

Moments later, a prospective juror said the defendants "do not look guilty to me. They look like they have kind eyes, and they look like very nice boys. I would really have to be convinced that they had done the wrong thing . . . because they don't show that." In response, the trial court displayed a photograph of Ted Bundy. The juror agreed Bundy had kind eyes and was nice-looking. The following colloquy then occurred:

"THE COURT: Anybody recognize him? Anyone?

"PROSPECTIVE JUROR No. 9 . . . : Ted Bundy.

"THE COURT: Who is Ted Bundy, Juror No. 9? What did he do?

"PROSPECTIVE JUROR No. . . . : Serial killer. Killed 14 women.

. . . . . . . . . . . . . . .

. . . . . . . . . . . . . . .

"THE COURT: Oh, no. More like 40 women. [¶] Why do I have this, ladies and gentlemen? Oftentimes that is what people are looking for. They are looking for an

29

image that fulfills stereotypes. Well, this person looks guilty; this person doesn't look guilty. People don't judge what they look like or don't look like. We judge by the evidence."

The trial court then said: "And you see how somebody that looks kind can get away with things? I'm not saying these good looking men here are responsible for anything they are charged with. I'm saying you don't judge people by how consistent [*sic*: innocent?] or mean they look. You judge by the evidence that is presented. [¶] Everybody get that?"

When Brown's attorney questioned the prospective jurors, he followed up on the trial court's theme by referring to the Bundy photograph and saying: "[T]he court talked about judging people . . . not [to] judge them on the way they look, but on what they say." McLeod's attorney did the same, invoking the "Don't judge a book by its cover" maxim, and asking: "Has anyone else been in a situation where they felt judged by the way they look?"

    b. *Legal principles.*

A trial court "retains great latitude in deciding what questions should be asked on *voir dire*." (*Mu'Min v. Virginia* (1991) 500 U.S. 415, 424 [111 S.Ct. 1899].) "[B]ecause the trial court 'is in the best position to assess the amount of voir dire required to ferret our latent prejudice, and to judge the responses' [citation], it has wide discretion in conducting voir dire in areas of inquiry that might disclose juror bias and ' "in deciding what questions should be asked on *voir dire*." ' [Citation.] It abuses that discretion if its failure to ask questions renders the defendant's trial ' "fundamentally unfair" ' or ' " 'if the questioning is not reasonably sufficient to test the jury for bias or partiality.' " [Citation.]' [Citation.]" (*People v. Taylor* (2010) 48 Cal.4th 574, 608.)

"We 'evaluate the propriety of judicial comment on a case by case basis, noting whether the peculiar content and circumstances of the court's remarks deprived the accused of his right to trial by jury.' [Citation.]" (*People v. Sanders* (1995) 11 Cal.4th 475, 531-532.)

c. *Discussion.*

Defendants contend they were prejudiced because the trial court in effect linked them with the "good looking" serial killer Ted Bundy. Brown argues: "[T]he trial court's comments conveyed the belief that nice-looking defendants should not have the benefit of a good impression; such defendants, like [Ted] Bundy, actually were likely to be guilty. . . . A prospective juror had just commented that because one of the defendants was nice-looking, he did not appear guilty. The timing of the court's remarks effectively dispelled any favorable impression jurors might have had of Brown and his co-defendants based on their appearance. Thus, Brown and his co-defendants started out the trial not presumed innocent but presumed guilty . . . ." Miller argues: "The jury could have reasonably understood the comment as a suggestion that the handsome defendant, like serial rapist and killer Ted Bundy, could be guilty. . . . As appellant was called handsome, he started out the trial presumed guilty."

We disagree. All the trial court did was point out that even someone as nice looking as Ted Bundy could be guilty of horrendous crimes. Although it would have been judicial misconduct to suggest that because the defendants had a pleasing appearance they were likely to be guilty, this message cannot reasonably be gleaned from the trial court's remarks. The trial court clearly informed the prospective jurors they should decide the case based on the evidence, not on whether the defendants looked guilty or not guilty.

6. *Trial court did not err by admitting evidence of defendants' extra-judicial statements acknowledging involvement in the killings.*

There was evidence McLeod told D.H. the defendants had robbed and killed Wheeler. There was evidence Brown told S.T. that he and McLeod had shot and killed two people on Exmoor. Brown said he used an AK-47 to shoot one of the victims and McLeod shot the other victim. On appeal, defendants contend the trial court erred by admitting these statements. This claim is meritless. The statements were trustworthy, nontestimonial declarations against interest and, therefore, admissible under Evidence Code section 1230.

31

a. *Legal principles.*

"In California, '[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.' ([Evid. Code,] § 1230.) The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character. [Citation.]" (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611.)

"To determine whether the declaration passes the required threshold of trustworthiness, a trial court 'may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.] On appeal, the trial court's determination on this issue is reviewed for abuse of discretion. [Citation.]" (*People v. Cudjo* (1993) 6 Cal.4th 585, 607; see also *People v. Lawley* (2002) 27 Cal.4th 102, 153-154 [trial court's decision whether statement is against defendant's penal interest is reviewed for abuse of discretion].) "We have recognized that, in this context, assessing trustworthiness ' "requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception." ' " (*People v. Duarte, supra*, 24 Cal.4th at p. 614.) As we have noted, although " '[t]here is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. . . . [¶] . . . the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures. [Citations.]' [Citation.]" (*People v. Cervantes* (2004) 118 Cal.App.4th 162, 175.)

32

b. *Discussion*.

(1) *McLeod's Statement to D.H.*

Brown and Miller properly concede McLeod's statement to D.H. was not testimonial. McLeod made the statement in private to D.H., his long-time friend and fellow Nutty Blocc Crip gang member, and their conversation took place in D.H.'s room at the house where he lived with his mother and grandmother. (See *People v. Cervantes*, *supra*, 118 Cal.App.4th at pp. 173-174 [codefendant's statements to long-time friend were nontestimonial].)

Nevertheless, defendants argue their confrontation clause rights were violated because admission of this evidence violated the rule of *Aranda-Bruton*.[6] As our Supreme Court explained in *People v. Lewis* (2008) 43 Cal.4th 415, 453: "A criminal defendant has a right, guaranteed by the confrontation clause of the Sixth Amendment to the United States Constitution, to confront adverse witnesses. The right to confrontation includes the right to cross-examination. [Citation.] A problem arises when a codefendant's confession implicating the defendant is introduced into evidence at their joint trial. If the declarant codefendant invokes the Fifth Amendment right against self-incrimination and declines to testify, the implicated defendant is unable to cross-examine the declarant codefendant regarding the content of the confession."

"[U]nder *Bruton* and its progeny, a codefendant's hearsay statement *is* admissible 'if it falls within a "firmly rooted" hearsay exception or is "supported by a showing of particularized guarantees of trustworthiness." [Citations.]' [Citation.]" (*People v. Arceo* (2011) 195 Cal.App.4th 556, 571.) Defendants cite *People v. Garcia* (2008) 168 Cal.App.4th 261, 282, fn. 12, for the proposition that "[w]hether the *Aranda/Bruton* rule applies only to extrajudicial *testimonial* statements appears to be an unsettled question." However, "since *People v. Garcia*'s observation, a number of federal courts

---

[6] *Bruton v. United States* (1968) 391 U.S. 123 (88 S.Ct. 1620); *People v. Aranda* (1965) 63 Cal.2d 518.

have expressly held that the *Bruton* rule does not apply to nontestimonial statements." (*People v. Arceo, supra,* at p. 574.)

It also appears the statement was trustworthy. The conversation took place less than 24 hours after the killings, McLeod spoke from direct personal knowledge, and he had no reason to lie to D.H.

Defendants argue there were inconsistencies that rendered the evidence untrustworthy because D.H. wavered on the witness stand about whether McLeod had implicated himself. Not so. "When evidence is offered under one of the hearsay exceptions, the trial court must determine, as preliminary facts, both that the out-of-court declarant made the statement as represented, and that the statement meets certain standards of trustworthiness. [Citation.] The first determination – whether the declaration was made as represented – is governed by the substantial evidence rule. The trial court is to determine only whether there is evidence sufficient to sustain a finding that the statement was made. [Citation.] As with other facts, the direct testimony of a single witness is sufficient to support a finding unless the testimony is physically impossible or its falsity is apparent 'without resorting to inferences or deductions.' [Citations.] *Except in these rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution; such doubts do not afford a ground for refusing to admit evidence under the hearsay exception for statements against penal interest.* [Citations.]" (*People v. Cudjo, supra,* 6 Cal.4th at pp. 608-609, italics added.)

### (2) *Brown's Statement to S.T.*

Miller properly concedes Brown's statement to S.T. was not testimonial. Brown made the statement in private to S.T. at her home in Long Beach, a few months after the killings. S.T. had not only become an active Nutty Blocc Crip gang member, but she and Brown committed crimes together and were involved in a sexual relationship. Rather, Miller argues Brown's statement "was not trustworthy since it was both inculpatory and exculpatory. He implicated himself. But he also shifted the blame to others." Not so. Brown merely told S.T. that he, McLeod and J-Capone had killed two people on Exmoor,

34

that he had "used an AK" and that McLeod "shot the other person." This does not constitute "shifting the blame to others."

7. *Trial court did not err by admitting consciousness of guilt evidence relating to Wheeler's mother.*

A day or two after Leggette and Wheeler were killed, Miller instructed M.H. to tell Wheeler's mother that M.H. had seen "some Mexicans" rob and kill her son. A few minutes later, Brown told M.H. not to get involved and not to approach Wheeler's mother. Defendants contend this was inadmissible hearsay evidence. Not so. The statements were not hearsay, and they were relevant and admissible to show consciousness of guilt on the part of Miller and Brown.

Evidence Code section 1200, subdivision (a), provides: " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." If a statement "was not offered for the truth of the matter asserted, it was not hearsay at all and no hearsay exception was required to be found." (*People v. Gutierrez* (2000) 78 Cal.App.4th 170, 174, fn. 4.; see, e.g., *People v. Curl* (2009) 46 Cal.4th 339, 362 [after being informed he had been accused of murder, extra-judicial declarant asked witness to tell family member to get rid of his boots: the declarant's "statement was not hearsay but simply verbal conduct consisting of a directive that was neither inherently true nor false"].)

Miller's demand that M.H. lie to Wheeler's mother about the death of her son was relevant and admissible to prove Miller's consciousness of guilt. "[F]alse statements by a defendant are admissible to demonstrate consciousness of guilt. [Citation.]" (*People v. Hughes* (2002) 27 Cal.4th 287, 335, fn. omitted.) Similarly, Brown's direction to M.H. not to get involved and not to approach Wheeler's mother was relevant to prove Brown's own consciousness of guilt: it was reasonable to infer he intervened because he knew the killings had not been committed by "some Mexicans."

35

8. *Evidence of Miller's relationship with M.H. was properly admitted.*

Miller contends[7] the trial court erred by admitting evidence of the crimes he committed against M.H., sexual assault and kidnapping, as well as evidence of the voicemail messages he left for her on the eve of trial. This claim is meritless.

a. *Background.*

In December 2005, Miller was arrested and charged with having kidnapped M.H. and having committed various sex offenses against her, including pimping a minor for prostitution. Following a trial at which M.H. testified, Miller was sentenced to prison for 85 years to life.

Before M.H. testified in the case at bar, the prosecutor informed the trial court he did not intend to offer any evidence about M.H.'s former testimony or the fact Miller had been convicted. However, he did want to introduce evidence regarding the nature of M.H.'s prior relationship with Miller in order to show why Miller felt secure enough to order her to lie to Wheeler's mother, and to show that the voicemail messages he left had been intended to affect M.H.'s testimony. The prosecutor wanted to have M.H. testify to the following: She first met Miller when she was 14 years old; they were having a sexual relationship in September-October 2005; Miller forced her to have sex with him and then forced her to have sex with other men for money; their relationship ended in December 2005 when the police rescued her from the Bellflower motel where Miller had taken her.

The trial court ruled evidence about M.H.'s age and her intimate relationship with Miller was relevant and admissible, but that Miller's conviction in the other case was irrelevant. At Miller's request, the trial court also excluded evidence M.H. had testified against Miller at his previous trial.

On direct examination, M.H. testified accordingly. During cross-examination, defense counsel asked questions suggesting Miller did not kidnap M.H., but rather that she ran away from home because her father had been molesting her, and this was why she

---

[7] Brown and McLeod join this contention to the extent it may benefit them.

never reported the alleged kidnapping to the police. In response to this cross-examination, the trial court allowed M.H. to testify that she did report Miller to the police, charges were filed against him, and she testified against him at his trial.

The trial court also allowed the prosecution to play a tape recording of the voice mail messages Miller had left. (See fn. 4, *ante*.) The trial court reasoned the tone of Miller's voice suggested he was trying to intimidate M.H. on the eve of trial, and that the tape could help the jury better understand M.H.'s testimony about Miller's directing her to speak to Wheeler's mother.

> b. *Discussion*.

Miller argues this evidence should not have been admitted because it was both irrelevant and prejudicial. He asserts the evidence had no probative value because "[t]he real issue . . . was whether [Miller] was involved in the crimes or in Lancaster at the hospital during the shootings. Evidence [he] kidnapped and had unlawful sex with [M.H.] when she was a minor and left intimidating messages on her answering machine added nothing to help the jury decide the case. The crimes were not even similar to those charged." Miller argues M.H.'s testimony that "she spoke with the police about the kidnapping and forced sex" was only relevant "to show appellant as a deviant sexual predator." We disagree.

The voicemail messages Miller left for M.H. tended to show he was trying to keep her from testifying against him. The trial court listened to the messages and deemed them admissible because Miller's tone suggested he was trying to intimidate her. This decision was well within the trial court's discretion. "Evidence of efforts to intimidate a witness is . . . admissible to show a defendant's consciousness of guilt if there is evidence the defendant authorized or acquiesced in the efforts." (*People v. Valdez* (2012) 55 Cal.4th 82, 135, fn. 32.)

Miller's relationship with M.H. was relevant and admissible to explain why a 29-year-old man, in an effort to deflect suspicion from himself, would tell a 14-year-old girl to lie to a murder-victim's mother about who was responsible for the crime. Evidence showing Miller had a pimp-prostitute relationship with M.H. suggested he chose her to

deliver this message because he knew she was susceptible to his manipulation, and thus he had no fear she would report him to the authorities.

By suggesting M.H. never reported any of this to the police, Miller was trying to undermine her credibility and he thereby opened the door to evidence showing he had been convicted for committing sexual offenses against her. (See *People v. Cleveland* (2004) 32 Cal.4th 704, 745 ["Without context, [the witness's] protestations . . . might appear disingenuous, which would cast doubt on her credibility. It was thus appropriate for the district attorney to supply the context . . . ."].) Miller also opened the door to evidence of his 2010 voice mail messages by suggesting through his questioning that M.H. was on friendly terms with him. For example, defense counsel asked her: "Are you guys still friends, do you keep in touch?"

M.H.'s credibility was important because the incident about talking to Wheeler's mother was one of the key pieces of evidence discrediting Miller's elaborate alibi defense. Under Evidence Code section 352, a trial court has discretion to exclude evidence if its probative value is substantially outweighed by the probability of wasted time or the danger of undue prejudice, confusing the issue, or misleading the jury. (Evid. Code, § 352.) A trial court's exercise of this discretion will not be overturned on appeal absent a showing its discretion was abused. (*People v. Raley* (1992) 2 Cal.4th 870, 895; see also *People v. Von Villas* (1992) 10 Cal.App.4th 201, 268 [decision to admit or exclude evidence lies within discretion of trial court and erroneous decisions are tested under *Watson*[8] harmless error standard].) The evidence of Miller's crimes against M.H. would surely have troubled the jury, but so would the evidence of Miller's role in murdering two men. Thus, in the context of the facts of this case, the potentially prejudicial prior sexual conduct evidence was not particularly inflammatory. (See *People v. Kipp* (1988) 18 Cal.4th 349, 372 [risk of prejudice "was not unusually grave" where the prior "crimes were not significantly more inflammatory than the [current] crimes"].)

---

[8] *People v. Watson* (1956) 46 Cal.2d 818, 836.

9. *Trial court did not err by admitting evidence regarding the intimidation of D.H.*

Defendants contend the trial court erred by letting D.H. testify about having been threatened and spat on during the jail bus ride to the defendants' preliminary hearing. This claim is meritless.

a. *Background.*

In a pretrial police interview, D.H. said McLeod told him all three defendants had participated in the killings. But at the preliminary hearing, and then during the initial portion of his trial testimony, D.H. said McLeod only told him Miller and Brown were the perpetrators without saying that he himself had participated. When the prosecutor challenged this testimony as inconsistent with what he told the police, D.H. acknowledged the inconsistency but testified he could not explain why his story had changed. The prosecutor asked D.H. if he were afraid. D.H. said he was, and then testified about having been threatened on the bus and spat on by Miller.

b. *Discussion.*

Defendants argue this testimony was not relevant to credibility or impeachment, and constituted improper impeachment of the prosecution's own witness under Evidence Code section 785. We disagree.

Following the enactment of the Evidence Code, any party may freely impeach any witness with a prior inconsistent statement. Defendants' reliance on pre-Evidence Code case law for the proposition that the impeached testimony must be prejudicial and detrimental is unpersuasive. "The general rule against impeaching one's own witness . . . was abrogated by the Legislature's passage of Evidence Code section 785 in the same year it passed Evidence Code section 1202. Evidence Code section 785 provides: 'The credibility of a witness may be attacked or supported by any party, including the party calling him.' Significantly, Evidence Code sections 785 and 1202 were not only passed in the same year; *they were passed as part of the same bill*. [Citation.] . . . Read together as a single statute, these two sections allow a prosecutor to use a prior

39

inconsistent statement to partially impeach a hearsay statement the prosecutor had previously introduced." (*People v. Osorio* (2008) 165 Cal.App.4th 603, 616-617.)

"A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.)

"As we have recognized, '[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court. [Citations.]' [Citations.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1084; see *People v. Olguin, supra,* 31 Cal.App.4th at p. 1368 ["A witness who testifies despite fear of recrimination of *any* kind by *anyone* is more credible because of his or her personal stake in the testimony"].) D.H.'s testimony about the bus ride was admissible to show he was afraid to testify and served to rebut the blow to his credibility arising from the fact he kept contradicting himself about what McLeod told him.

The trial court did not err by admitting this evidence, which was more probative than prejudicial.

10. *Trial court properly excluded questions to D.H. about an unrelated murder*.

Defendants contend the trial court erred by sustaining an objection to Miller's continuing cross-examination of D.H. about whether he had committed an unrelated murder. This claim is meritless.

During cross-examination, Miller's counsel asked D.H. if it weren't true that he had killed someone named Darren Gunther. The prosecutor objected and the trial court, at a sidebar conference, asked for an offer of proof for this line of questioning. Defense counsel said he had learned of this murder from Miller. McLeod's attorney said he, too, understood D.H. had killed Gunther, but asserted the attorney-client privilege when the trial court asked him the basis for his understanding. After all three defense attorneys

40

said they had no intention of pursuing the issue, the trial court said, "Let's not get into it. I didn't hear an offer of proof on it. If one develops later on [D.H.] will be available if you need him."**9**

Instead of demonstrating on appeal the relevance of this alleged murder, McLeod merely argues: "The exclusion of the inquiry must be examined as a question of fairness and parity. The state charged appellant with murder. That charge was an allegation, nothing more. The prosecutor wasn't required to make an offer of proof as to the charge before having witnesses testify about evidence of that murder charge, including claims that the defendants allegedly admitted involvement in the murder." This does nothing to demonstrate the trial court erred by excluding further questioning about an apparently unrelated murder. (See *People v. Quartermain* (1997) 16 Cal.4th 600, 625 [trial court did not abuse discretion by excluding impeachment on collateral matter]; see also *People v. Hayes* (1999) 21 Cal.4th 1211, 1266 & fn. 15 [disallowing impeachment of prosecution witness on collateral matter did not restrict defendant's right to confrontation and cross-examination].)

11. *Trial court did not err by not compelling D.H. to identify a potential witness.*

D.H. testified he had been with a friend at the Grandees when he heard the gunshots on the night of the killings, but he refused to identify this friend. The trial court concluded the friend's identity was irrelevant to the case. Defendants contend the trial court erred by not requiring D.H. to identify his friend. This claim is meritless.

Evidence Code section 210 provides: " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." " 'Although we recognize that a criminal defendant has a constitutional right to present all relevant evidence of *significant* probative value in his favor [citations], "[t]his does not mean that an unlimited inquiry may be made into

---

**9**     D.H. subsequently testified he had never killed anyone.

41

collateral matters; the proffered evidence must have more than 'slight-relevancy' to the issues presented." [Citation.]' [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 865.) A trial court's determination that evidence is irrelevant is reviewed for an abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.)

McLeod asserts D.H.'s unnamed friend was "a critical defense witness," but he never explains why. McLeod asserts the evidence "impacted [D.H.]'s credibility, it would have allowed for an opportunity to impeach [D.H.], a key witness for the State, and it was a piece of discoverable evidence that would have lead [*sic*] to a witness for the defense." But again, he fails to elaborate on any of these conclusory assertions.

McLeod's only articulated argument concerns D.H.'s testimony that he walked fast toward the sound of the gunshots, which "took a few minutes," but "by the time he arrived the police were already there, and the yellow police tape was already up." McLeod claims "[t]his testimony is simply not believable" because the police could not possibly have gotten to the scene so quickly: "Since [D.H.] offered no indication he was in error about the facts, the reasonable conclusion is that he lied. His friend would have offered some clarity to this testimony."

The far more reasonable conclusion, however, is that D.H. simply misjudged how much time had passed before the police arrived. In any event, there is no logical nexus whatsoever between what D.H. and his friend witnessed that night, and D.H.'s testimony that on the following day he heard McLeod admit his role in the killings. D.H. did not claim to have witnessed the killings; he merely heard gunshots, as did numerous other witnesses. The identity of his friend was irrelevant because it did not have a tendency to prove or disprove a disputed fact that was "*of consequence* to the determination of the action." (Evid. Code, § 210, italics added.)

The trial court therefore properly exercised its discretion by telling defendants to move on to more-relevant cross-examination topics. (See *People v. Marshall* (1996) 13 Cal.4th 799, 836 ["Although a criminal defendant is constitutionally entitled to present all relevant evidence of significant probative value in his favor, this does not mean the

court must allow an unlimited inquiry into collateral matters; the proffered evidence must have more than slight relevancy."].)

12. *Trial court did not err by permitting witness to testify while wearing sunglasses.*

Defendants contend their convictions must be reversed because the trial court allowed a prosecution witness to testify while wearing sunglasses. This claim is meritless.

a. *Background*

J.S. was one of the teenagers who saw the black Pontiac Grand Am drive up and down Exmoor Avenue several hours before the killings. J.S. saw two men in the car, the driver and a passenger, but he did not get a good look at either one. That evening, J.S. was inside his house when he heard gunshots. Seconds later he "heard . . . a car fly by" but he didn't really see the car.

A few weeks after the killings, Detective Cochran showed J.S. some photo arrays to see if he could identify any of the Grand Am's occupants. J.S. said a photo of Brown looked familiar, but only a "4" on a scale of "10." At trial, J.S. testified this meant he was less than 50 percent sure of the identification because he had not gotten a good look at the person. J.S. testified he knew McLeod from school, but he did not see McLeod in the car that day. J.S. did not identify Miller as having been in the car.

When he testified at trial, J.S. sat in the witness chair wearing sunglasses. After he acknowledged they were not prescription glasses, the trial court asked him to remove them. But J.S. asked to keep them on and the trial court agreed. None of the defendants explicitly objected to J.S. wearing sunglasses, although Miller's attorney said, "If it's not for a medical reason, I would prefer any witness not to wear sunglasses. I think it assists the fact-finders in determining their demeanor while testifying." Counsel for Brown and McLeod did not say anything. Miller cross-examined J.S. about the quality of his vision, but not about the sunglasses. Brown and McLeod did not ask J.S. any questions about his vision or why he was wearing sunglasses.

43

Asked if he were scared, J.S. answered "not really," but he acknowledged having told the prosecutor and Detective Cochran he did not want to testify. The trial court later described J.S. as "a fearful witness who lives inside of Nutty Blocc Crips' claimed turf."

Eleven days after J.S. testified, Brown moved to strike his testimony on the ground he had worn sunglasses on the stand. Miller joined the motion, but McLeod expressly declined to join. The trial court denied the motion, although it offered to consider an appropriate instruction to the jury if the defendants proposed one. The trial court said, "[Y]ou know this case doesn't appear in a vacuum. And in the context of the community, for whatever reason, this witness wanted to keep some sort of privacy and some sort of perception of protection. . . . The jurors may certainly consider that. And counsel of course may argue that you didn't get to see his eyes. I will entertain any pinpoint instruction to point it out." However, the defendants did not request any jury instructions addressing the issue.

Subsequently, in denying Brown's motion for a new trial based on J.S.'s sunglasses, the trial court concluded the defendants had not been prejudiced: "*Sunglasses are not a very good disguise*. . . . In any event, this witness . . . is not a percipient witness to the homicides. This witness merely testified that he saw a vehicle earlier in the evening that he then saw later on at night after he heard gunshots, and he saw that same vehicle leaving. He . . . was not able to identify anybody inside that vehicle earlier in the day or did not recall . . . that he may have identified somebody that looked vaguely familiar to a six-pack, to detectives. [H]e did not identify anybody in court, so regarding [J.S.'s] permission to use sunglasses in court, I don't think there was any prejudice to the defendant." (Italics added.)

b. *Discussion*.

The confrontation clause gives a defendant "the right physically to face those who testify against him." (*Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 51 [107 S.Ct. 989].) "The primary object" of the confrontation clause is to ensure that a criminal defendant "has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may

44

look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." (*Mattox v. United States* (1895) 156 U.S. 237, 242-243 [15 S.Ct. 337].)

Citing *Coy v. Iowa* (1988) 487 U.S. 1012 [108 S.Ct. 2798], *Maryland v. Craig* (1990) 497 U.S. 836 [110 S.Ct. 3157], and *People v. Murphy* (2003) 107 Cal.App.4th 1150, defendants assert the trial court erred by allowing J.S. to testify without having first made an express finding he needed to wear the sunglasses and that public policy would be served by allowing him to do so. *Coy* held that allowing child sexual abuse victims to testify from behind a screen, which blocked them from the defendant's sight, violated the confrontation clause. (*Coy v. Iowa*, *supra*, at pp. 1020-1021.) *Craig* allowed a child victim to testify from outside the courtroom by means of a one-way closed circuit television. (*Maryland v. Craig*, *supra*, at pp. 851-852.) *Murphy* held that allowing an adult victim to testify from behind one-way glass, so she would not have to see the defendant, violated the confrontation clause. (*People v. Murphy*, *supra*, at pp. 1157-1158.)

But here, J.S. testified in person, from inside the courtroom and in full view of the defendants except for the fact his eyes were obscured. As the trial court noted, "Sunglasses are not a very good disguise." In *Morales v. Artuz* (2d Cir. 2002) 281 F.3d 55, the trial court allowed a principal witness to testify without removing her dark sunglasses. *Morales* pointed out: "Although *Craig* and *Coy* set forth the appropriate test where the witness is physically separated from the defendant, none of the cases thus far decided by the Supreme Court deals with our precise context – a witness testifying in the presence of the defendant and the jury with a *slight disguise* that prevents the defendant and the jurors from seeing the witness's eyes." (*Id*. at p. 58, italics added.)

*Morales* concluded the witness's sunglasses did not violate any clearly established federal law. "To the extent that the Supreme Court's 'established law' of confrontation seeks to assure cross-examination and an opportunity for the *witness* to see the *defendant*, Sanchez's sunglasses created no impairment. On the other hand, to the extent that the right assures an opportunity for the defendant and especially the jurors to see the

45

witness's eyes in order to consider her demeanor as an aid to assessing her credibility, some impairment occurred. Seeing a witness's eyes has sometimes been explicitly mentioned as of value in assessing credibility. [Citations.] In *Coy*, the Court noted that the trier of fact could 'draw its own conclusions' if the witness looked away from the defendant. [Citation.]" (*Morales v. Artuz, supra,* 281 F.3d at p. 60, fn. omitted.) *Morales* reasoned: "The obscured view of the witness's eyes . . . resulted in only a minimal impairment of the jurors' opportunity to assess her credibility. Even if we accept the idea, grounded perhaps more on tradition than on empirical data, that demeanor is a useful basis for assessing credibility, the jurors had an entirely unimpaired opportunity to assess the delivery of Sanchez's testimony, notice any evident nervousness, and observe her body language. Most important, they had a full opportunity to combine these fully observable aspects of demeanor with their consideration of the substance of her testimony, assessing her opportunity to observe, the consistency of her account, any hostile motive, and all the other traditional bases for evaluating testimony. All that was lacking was the jury's ability to discern whatever might have been indicated by the movement of her eyes." (*Id*. at pp. 60-62, fns. omitted.)

*Morales* was followed by the Massachusetts Supreme Court in *Commonwealth v. Lynch* (2003) 789 N.E.2d 1052, 1060: "Even if Moosick had worn dark glasses of some type, there is no basis on which to conclude that it created a substantial likelihood of a miscarriage of justice. 'Face to face' confrontation does not mean 'eye to eye,' [citation], and wearing dark glasses does not prevent exposure of a witness's face. [Citation.]" The Texas Court of Criminal Appeals found a confrontation clause violation in a sunglasses case, but only because there had been much more to the "disguise." There, a key state witness testified while "wearing dark sunglasses, a baseball cap pulled down over his forehead, and a long-sleeved jacket with its collar turned up and fastened so as to obscure Vasquez's mouth, jaw, and the lower half of his nose. The net effect and

46

apparent purpose of Vasquez's 'disguise' was to hide almost all of his face from view." (*Romero v. State* (Tex.Crim.App., 2005) 173 S.W.3d 502, 503, fn. omitted.)**10**

We agree with these analyses and conclude there was no confrontation clause violation here.

Moreover, even had there been a confrontation clause violation, it would have been harmless. Unlike the situations in *Coy*, *Craig*, and *Murphy*, where the witnesses in question were the alleged victims, J.S. was merely a bystander witness, he did not see the crimes being committed, he did not testify the defendants made inculpatory statements to him, and at most he had made a very equivocal identification of one defendant. (Compare *People v. Murphy*, *supra*, 107 Cal.App.4th at p. 1158 [error not harmless "especially since the pivotal issue was the alleged victim's credibility"].)

We conclude the trial court did not err by letting J.S. wear his sunglasses while testifying.

13. *Guns and ammunition evidence properly admitted.*

Defendants contend the trial court erred by admitting evidence Miller possessed guns and exchanged them with McLeod, and evidence Miller possessed ammunition that was different from the ammunition used in the killings. This claim is meritless.

a. *Background.*

M.H. told police she had seen Miller with guns, that he would keep them in the trunk of his car, and that he would switch guns with McLeod. M.H. also saw Miller with a handgun around the time of the killings.

---

**10**     *Romero* also said: "[N]or is this a case in which the defendant was shown to belong to a crime syndicate or a street gang from which retaliation might be anticipated," "the disguise consisted of far more than sunglasses," and "we cannot say that the testimony was cumulative and thus harmless." (*Romero v. State, supra,* 173 S.W.3d at pp. 506, 507.) As to all three of these factors, the situation in the case at bar was precisely the opposite: J.S.'s disguise consisted of nothing more than his sunglasses, the defendants did belong to a violent street gang, and he was not a key witness.

When Detective Cochran searched Miller's impounded car, he found two boxes of ammunition and a police scanner in the trunk. The ammunition did not match the spent cartridges found at the crime scene. Outside the jury's presence, the prosecutor explained this evidence was being offered to show Miller was still participating in gang activities despite his claim of having quit the Nutty Blocc Crips. The trial court admitted the ammunition and the police scanner into evidence on the ground they were more probative than prejudicial, both as to the murder charges and the gang-enhancement allegation.

When he testified, Miller denied the ammunition and police scanner belonged to him, although he had no explanation for how these items found their way into his car. He testified: "I didn't have those bullets in the trunk. [¶] . . . [¶] That was not my scanner. It was put there."

b. *Legal principles.*

Defendants cite a line of cases based on *People v. Riser* (1956) 47 Cal.2d 566, disapproved on other grounds by *People v. Chapman* (1959) 52 Cal.2d 95, 98, which said: "When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon. [Citations.] When the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Riser, supra,* at p. 577.)

However, our Supreme Court subsequently broadened *Riser*, holding that even where it is clear the weapon was not the one used to assault the victim there may be some situations in which it would be relevant and properly admitted into evidence. (See *People v. Smith* (2003) 30 Cal.4th 581, 613-614 [evidence defendant possessed gun unrelated to murder was properly admitted because it contradicted accidental shooting defense]; *People v. Neely* (1993) 6 Cal.4th 877, 896 [where victim killed by .22-caliber

48

bullet, evidence of .30-caliber gun and ammunition found in defendant's truck at crime scene shortly after the shooting was properly admitted].)

Miller testified he was no longer associating with the Nutty Blocc Crip gang at the time of the killings because he had given his life over to Christ. Evidence that he had boxes of ammunition and a police scanner in his car was relevant to impeach this testimony and to show Miller was still active in the gang. This evidence, in turn, was relevant to the gang-enhancement allegations because it showed that active Nutty Blocc Crip gang members had carried out the killings. The evidence was relevant to the underlying charges because it tended to show Miller was still associating with Brown and McLeod.

Moreover, M.H. did not specify what type of handgun or other guns Miller possessed and exchanged with McLeod around the time of the killings. The weapons used in the killings were a .45 caliber handgun and a semiautomatic rifle. Evidence that Miller possessed a "handgun," kept "guns" in the trunk of his car, and exchanged "guns" with McLeod was admissible because M.H.'s unspecified description did not rule out the possibility these could have been the guns used. (See *People v. De La Plane* (1979) 88 Cal.App.3d 223, 239, disapproved on other grounds in *People v. Green* (1980) 27 Cal.3d 1, 39, fn. 25 [sawed-off axe handle found in defendant's house admissible because expert testified it *could* have caused victim's wound].)

This evidence was properly admitted.

14. *There was no prosecutorial misconduct.*

Defendants contend their convictions must be reversed for prosecutorial misconduct. This claim is meritless.

a. *Legal principles.*

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the

49

defendant's specific constitutional rights – such as a comment upon the defendant's invocation of the right to remain silent – but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.] [¶] ' "[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion – and on the same ground – the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" ' " (*People v. Riggs* (2008) 44 Cal.4th 248, 298.) A defendant who fails to object at trial "waive[s] any error or misconduct emanating from the prosecutor's argument that could have been cured by a timely admonition." (*People v. Wrest* (1992) 3 Cal.4th 1088, 1105.)

" ' "[T]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom." ' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 752.) "When we review a claim of prosecutorial remarks constituting misconduct, we examine whether there is a reasonable likelihood that the jury would have understood the remark to cause the mischief complained of. [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 689.) "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

b. *There was no harmful late disclosure of evidence.*

Defendants contend that a small proportion of the trial evidence should have been provided to them sooner than it was. However, defendants never explain exactly how they were harmed by these purported late disclosures. At most, they offer only gross generalizations, such as when Miller argues: "[T]he prosecutor's belated disclosures of

50

the exhibits diminished the defense's ability to properly prepare for trial." The specific exhibits complained about are as follows:

(1) *People's Exhibit No. 126*

When the prosecutor showed a police officer the photograph of a purported gang member, McLeod's attorney objected he had not seen "the exhibit" before. After the prosecutor noted he had used this photograph during his opening statement, defense counsel said, "Objection to the photograph. It is not just a photograph of the person who has been identified." After the prosecutor pointed out the item had been used in its entirety during opening statement, and shown to all defense counsel prior to that, the trial court allowed the prosecutor to ask the witness about it and show it to the jury. Defendants have not demonstrated there was any late disclosure of this exhibit.

(2) *People's Exhibit No. 130*

The prosecutor wanted to show D.H. a photograph in which he appeared. After an initial defense objection was overruled, a subsequent objection led to a sidebar discussion regarding the proper manner of publishing photographs to the jury. When defense counsel complained the prosecutor had left the photograph on the overhead projector while defense counsel was still arguing the objection, the prosecutor pointed out he published the photo after the trial court had overruled an objection, only to have defense counsel make a new objection. To this explanation by the prosecutor, the trial court replied: "I understand." Defendants have not demonstrated there was any late disclosure connected to this exhibit.

(3) *D.H.'s testimony that defendants Brown and Miller possessed firearms.*

The prosecutor informed defense counsel that during the lunch break D.H. said he had seen Miller in possession of a "semiautomatic AK" around the time of the killings, that D.H. had borrowed this gun (which Miller referred to as a "30-30"), and that he had seen Brown carrying a "four-five." The prosecutor immediately informed defense counsel of this new information. The trial court then held an evidentiary hearing at which

51

D.H. confirmed he had just given this information to the prosecutor during the lunch break.  The court allowed D.H. to testify about his observations.

Brown argues:  "[I]t seem[s] unlikely this information was unavailable for disclosure prior to that point.  [D.H.] had been a prosecution witness for some time and this was crucial information linking the defendants to the shootings."  But mere speculation that the prosecutor was aware of this information at an earlier time is insufficient to establish prosecutorial misconduct.

(4) *The recording of Miller's phone call with his mother.*

On a Friday, after the lunch break, the trial court held a hearing on the admissibility of a recorded phone call between Miller and his mother, Earline, which the prosecutor wanted to use while cross-examining Earline.  McLeod's counsel objected: "Just because counsel chose not to disclose it until after the lunch hour, he didn't give it to us at the beginning of the lunch hour so we could listen to it during the lunch hour. This is the first I'm hearing . . . the tape. . . .  [¶]  Yes, I understand under Prop. 115 he doesn't have to disclose rebuttal evidence until we present primary evidence, but he should have had the CD readied for each counsel and take a 15-minute break to listen to it and have a rational discussion on admissibility."  The trial court ruled the recording was relevant and could be played for the jury because it went to Earline's credibility.

The record indicates the prosecutor provided a copy of the recording itself to Miller's counsel at the end of the lunch break, but that the recording had not yet been transcribed.  The prosecutor argued the recording was clean and he believed no transcript would be necessary.  He agreed to make additional copies of the recording for Brown and McLeod before the weekend, and to have the recording transcribed before trial resumed the following Tuesday.  The court ordered Earline to return to court on Tuesday in case defense counsel wished to question her further about the recording.

Defendants fail to specify how they were harmed by this episode.

(5) *People's Exhibit Nos. 196, 197 and 198.*

During the cross-examination, the prosecutor showed Miller's handwriting expert, Kurt Kuhn, three documents containing Miller's signature and asked if he had ever seen them before. Miller's attorney complained the documents were irrelevant and that no foundation had been laid. McLeod's attorney said he hadn't seen the documents before. The trial court allowed the prosecutor to show Kuhn the documents. Showing Kuhn examples of Miller's signature he had never seen before was relevant to an evaluation of Kuhn's expert opinion.

There is no explanation of how this episode harmed the defendants. Both handwriting experts opined Miller had probably filled out portions of the hospital registration form.

c. *Prosecutor did not present false evidence.*

Defendants contend the prosecutor presented false evidence by D.P. The record shows, however, that D.P. merely gave inconsistent testimony.

On direct examination, D.P. testified she overheard Brown and McLeod laughing and telling other Nutty Blocc Crips they had obtained a lot of money by "hitting a lick," i.e., by robbing someone. D.P. also testified that a few days after the killings Brown began selling marijuana just like the marijuana Wheeler had been selling. On cross-examination, D.P. testified she did not know who made the "hit a lick" comment, and that it had been her roommate, not she, who made the initial purchase of marijuana from Brown two or three days after the killings.

Other evidence, however, established these were merely testimonial inconsistencies. D.P. testified her "roommate's" answer had been incorrect because she was nervous, and that she herself had purchased marijuana from Brown more than once after the killings. D.P. testified she told Detective Cochran that she heard Brown and McLeod "talking about coming up on a good lick." Detective Cochran testified that when he interviewed D.P. at the time of the killings she reported overhearing Brown and McLeod talk about coming up on a good lick.

The record shows D.P. merely gave conflicting testimony, not false testimony.

53

d.  *Prosecutor did not elicit evidence that had been excluded by the trial court.*

Defendants contend the prosecutor deliberately elicited testimony from D.H. that the trial court had already excluded.  Not so.

The trial court ruled D.H. could not testify someone had shot at his mother's house for a reason he suspected was connected to this case.  The proceedings paused so the prosecutor could advise D.H. not to mention the incident, and the trial court heard the prosecutor give D.H. the admonishment.

The prosecutor subsequently posed this question to D.H.:  "[W]hat, if anything, is making you feel afraid that you're not giving us 100 percent truthful testimony?"  The witness turned to the judge and asked if he could answer truthfully, and the trial court responded, "Go ahead, sir."  D.H. then said, "Because I don't . . . want my house to get shot up again."  The court struck this answer, but concluded:  "[G]iven the fact that I heard Mr. McKinney [i.e., the prosecutor] talking to Mr. D.H. . . . and telling him not to mention it, I don't think there is any misconduct by the prosecutor."

" ' "It is, of course, misconduct for a prosecutor to 'intentionally elicit inadmissible testimony.'  [Citations.]"  [Citation.]  Such misconduct is exacerbated if the prosecutor continues to attempt to elicit such evidence after defense counsel has objected.'  [Citation.]  However, a prosecutor cannot be faulted for a witness's nonresponsive answer that the prosecutor neither solicited nor could have anticipated.  [Citation.]"  (*People v. Tully* (2012) 54 Cal.4th 952, 1035.)

Brown argues that despite the prosecutor's admonishment, his "questions conveyed to D.H. the implication that his disclosure was permissible."  But this assertion – that the prosecutor must have known D.H. would violate the admonition and, therefore, purposely sought to elicit the impermissible answer – is mere speculation.  The trial court pointed out the prosecutor's question seemed to be aimed at the bus incident during which D.H. had been threatened.

54

e. *Prosecutor did not improperly refer to evidence outside the record.*

Defendants contend there were several instances in which the prosecutor improperly referred to evidence outside the record. This claim is meritless.

(1) *Comment about playing the entire recording of an interview.*

Brown cross-examined D.H. about certain statements he made during a July 2006 interview with Detective Duncan. In response to an objection from the prosecutor, the trial court asked if the parties would stipulate to having something read from the interview transcript as had been done the day before. When the prosecutor replied, "I would stipulate to playing the entire tape so the jury – ," McLeod's attorney interrupted: "Could we not have speaking objections and commentary?" At sidebar, defense counsel asked the trial court to admonish the prosecutor for misconduct on the ground the comment would cause the jury to think the defense was trying to hide something.

The trial court determined there had been no misconduct. The court said it was not inappropriate for the prosecutor to have responded "to the court's prompt" and, given the cross-examination of D.H., "it seems that most if not all" of the taped interview would come in, although the court would have preferred if the prosecutor had referred to playing the "appropriate or relevant . . . part of the tape" rather than "the entire tape." The trial court then asked all the parties to "speak thoughtfully when you say things on both sides so we have less of these type of discussions here at sidebar."

Ultimately, a redacted version of D.H.'s July 2006 interview was played for the jury. Defendants fail to explain how they were prejudiced by this episode.

(2) *Arguing about D.H.'s probation having been violated.*

Defendants contend the prosecutor committed misconduct during closing argument by referring to evidence he himself had gotten the trial court to exclude. The issue concerned whether D.H. had been facing a probation violation hearing when he met with police in July 2006, and therefore whether he believed he could personally benefit by giving them inculpatory information.

55

Detective Duncan and his partner, Sergeant Levins, interviewed D.H. on July 31, 2006. Toward the end of the interview, Levins mentioned having explained to D.H. that the officers would inform the District Attorney's Office about his cooperation "for consideration in your probation violation arrest." D.H., however, testified he did not recall facing a probation violation hearing when Duncan and Levins interviewed him in July 2006. Duncan testified he did not think D.H. had been facing a probation violation hearing at the time and that he didn't know why Levins made this comment. During cross-examination, defense counsel showed Duncan a court document indicating he had testified at D.H.'s probation violation hearing, and counsel asked if this refreshed his recollection. Duncan testified it did not. The trial court subsequently redacted most of the information in this court document, including the date the hearing had been set, but the court left the hearing date itself unredacted.

During closing arguments, defense counsel cited this document while arguing Duncan had lied when he said he did not recall testifying at D.H.'s probation violation hearing. In response, the prosecutor argued the court document showed the hearing had taken place in October 2006, not in July or August, which was consistent with D.H.'s testimony that he had not been facing a probation violation hearing when he was interviewed in July 2006. Defendants contend this argument by the prosecutor constituted misconduct because it relied on evidence the prosecutor had able to exclude, viz., the date when D.H.'s October 2006 probation violation hearing had been set.

Although it is improper for a prosecutor to tell the jury there is no evidence to support a defense point if it was the prosecutor who managed to have the evidence excluded (see, e.g., *People v. Varona* (1983) 143 Cal.App.3d 566, 568-570), that is not what happened here. The prosecutor told the jury this court document showed the probation violation hearing occurred in October, well after D.H.'s July police interview. The prosecutor never mentioned the absence of information regarding the setting date. When the trial court rejected defense counsel's request to have the jury informed the prosecutor had committed misconduct by "specifically [arguing] a fact he excluded," the

court disagreed, saying that is not what happened. We agree. This episode did not constitute prosecutorial misconduct.

### (3) *People's Exhibit No. 197.*

During a sidebar conference regarding the admissibility of People's exhibit No. 197, apparently a sample of Miller's signature which the prosecutor wanted to show to a defense handwriting expert, a defense attorney asked "What is the relevance?", to which the prosecutor said: "Because it is his signature." A different defense attorney said, "I think the jury heard that." Defendants contend this constituted prosecutorial misconduct. Miller argues, "By raising his voice, it was unlikely [the prosecutor] was not heard by some member of the jury."

There was no prosecutorial misconduct. The prosecutor's statement was a direct answer to the trial court's question asking why the exhibit was relevant, and the record does not show the jurors heard what the prosecutor said.

### f. *Prosecutor did not engage in improper vouching.*

Defendants contend the prosecutor improperly vouched for himself and for certain witnesses. "[I]t is misconduct for prosecutors to vouch for the strength of their cases by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it. [Citations.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 206-207.) However, "Prosecutorial assurances, *based on the record*, regarding the apparent honesty or reliability of prosecution witnesses, cannot be characterized as improper 'vouching,' which usually involves an attempt to bolster a witness by reference to facts *outside* the record. [Citation.]" (*People v. Medina* (1995) 11 Cal.4th 694, 757.)

### (1) *Detective Cochran's testimony about the jail bus.*

Defendants contend the prosecutor improperly injected himself during a portion of Detective Cochran's testimony. There was a question at trial about the internal configuration of the jail bus D.H. had been riding when Miller threatened him. Cross-examination of Cochran revealed the prosecutor himself had taken photographs of several jail buses. During redirect examination, Cochran explained the chain of events leading

57

up to the prosecutor taking these photographs. Brown's attorney argued this constituted improper vouching, but the trial court disagreed with this characterization, saying: "It is not vouching. It is something else."

The trial court was right. Cochran testified he had been asked by the prosecutor to photograph the internal configuration of the jail buses. After Cochran notified the prosecutor there were different configurations, the prosecutor went to the bus yard and took his own photographs. Cochran testified he and the prosecutor then discussed what they had found. Defendants argue the prosecutor was improperly acting like a witness. But their reliance on *United States v. Prantil* (9th Cir. 1985) 764 F.2d 548, is misplaced. In that case, the prosecutor played an active role in the circumstances of the alleged crime, but then refused to either testify or recuse himself. Here, the prosecutor offered to testify even though, unlike the prosecutor in *Prantil*, he lacked knowledge of any facts vital to the defense. There was no improper vouching.

(2) *Comments during closing argument*.

Defendants cite several instances from the prosecutor's closing argument which they contend constituted improper vouching. We disagree.

In discussing D.H.'s testimony, the prosecutor described D.H. as a witness who "came across as authentic and genuine and real. He didn't exaggerate anything. He just told it to the best of his recollection." Defendants did not object to these specific statements. A few moments later, however, Brown complained the prosecutor "was testifying" when he argued D.H. had been "trying to distance himself from the gang he said for the last couple of years" and "I think . . . the evidence has shown that he's trying to take his life in a different direction. And redemption for him starts with honesty even if it hurts. I think it did hurt him to testify especially against . . . Jeffrey McLeod." But none of these statements constituted improper vouching. (See *People v. Stansbury* (1993) 4 Cal.4th 1017, 1059, reversed on other grounds by *Stansbury v. California* (1994) 511 U.S. 318 [114 S.Ct. 1526] ["The argument that Allen was a believable witness who had done a great deal of soul searching was a proper comment on the evidence, not an attempt on the part of the prosecutor to personally vouch for the witness's credibility."].)

58

While discussing S.T.'s testimony, the prosecutor contrasted her agreement to tell the truth about anything she was asked in court with Miller's unwillingness to answer questions about the Nutty Blocc Crip gang, saying: "[A]nd I don't blame him." When Brown argued the prosecutor was giving his personal opinion, the trial court properly overruled the objection. While strictly speaking it might have been better had the prosecutor said "You can't blame him," the jury was unlikely to conclude the prosecutor was personally vouching for Miller's lack of credibility.

(3) *S.T.'s interview with a different prosecutor.*

During S.T.'s cross-examination, Brown asked about statements a different prosecutor had made to her in a November 2007 interview. Defense counsel asked: "Do you remember the District Attorney . . . asking you to figure out what exactly it is that you want. [¶] And then saying [if] we go to trial on a case like this and the jury knows you're facing life, that he was concerned you might say anything." Defense counsel also asked: "Do you remember him making a statement, 'I don't want to make it look like we're just going to give you anything you want.' " S.T. did not recall these statements until she was shown the transcript. In response, the prosecutor introduced additional portions of the interview, including the other prosecutor's statement: "[I]n reality . . . I'm not trying to put the wrong people in custody for things. I want to make sure and so I don't want to make it look like we're just going to give you anything you want."

Miller argues this was misconduct because the prosecutor "boosted the credibility of his office by disclosing to the jury the self-serving statement by another prosecutor and used his witness to convey to the jury how diligent and credible he was in trying the case." We disagree. The additional interview passages were relevant for context, to rebut an implication the prosecution was willing to do anything to get a conviction, and to assist the jury in judging S.T.'s credibility.

59

g. *Allegedly eliciting sympathy for the victim.*

"We have settled that an appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial; an appeal for sympathy for the victim is out of place during an objective determination of guilt. [Citations.]" (*People v. Stansbury, supra,* 4 Cal.4th at p. 1057.)

Defendants contend the prosecutor improperly elicited sympathy for Nakia Wheeler during closing argument, citing *People v. Vance* (2010) 188 Cal.App.4th 1182. But the objectionable conduct in that case went far beyond anything that happened here. The *Vance* prosecutor expressly urged the jurors to "walk in [the victim's] shoes," and "literally relive in your mind's eye and in your feelings what [the victim] experienced the night he was murdered." (*Id.* at p. 1194.) Here, by contrast, the prosecutor made relatively innocuous remarks about Wheeler's being a likable marijuana dealer who might have matured to pursue some legitimate line of work had he not been killed.

Brown argues the prosecutor committed misconduct "[b]y telling jurors that those who knew Nakia could now only view him in two-dimensional images [because] the prosecutor was in effect asking them to expand their empathy to the suffering of the victim's family and all who remembered Nakia." However, the "two-dimensional" comment had no such implication. The prosecutor told the jury: "But we'll never know if Nakia would have matured beyond where he was in life when he was killed. And the reason we'll never know is because these men destroyed his life. That is Nakia Wheeler from now on. That is Michael Leggette from now on. From now on, for eternity, they are photographs. They are no longer real people like I am standing here in front of you, a real person. From now on, that is all they are, two-dimensional photographs. Whenever they are talked about from now on, it is not going to be about the future. It is going to be about the past." The prosecutor was merely emphasizing to the jury, in a very dramatic fashion, that the two victims were forever dead.

h. *Allegedly casting aspersions on the defense.*

Part of the defense case was an attempt to paint Wheeler as a member of the Nutty Blocc Crips. According to the prosecutor, the defendants wanted "to dehumanize [Wheeler] or to make you care less that he was killed." To rebut this alleged gang connection, the prosecutor argued Wheeler had no gang tattoos, did not appear in any gang photographs, and neither his family, his friends nor the police believed he belonged to a gang. The prosecutor then said if defendants wanted to argue that the presence of a few gang members' phone numbers in Wheeler's cell phone address book made him a gang member "then I will let them make that argument with a straight face."

Defendants contend this improperly cast aspersions on the defense. "Although counsel have broad discretion in discussing the legal and factual merits of a case [citation], it is improper . . . to resort to personal attacks on the integrity of opposing counsel [citation]." (*People v. Bell* (1989) 49 Cal.3d 502, 538.) Here, the prosecutor's comment did not cast aspersions on the defense. It was a legitimate comment on the evidence and "no more than sarcastic hyperbole identifying what the prosecutor believed to be weakness in the defense explanation of the events." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1303, fn. 48.) The prosecutor's comment was not "likely to have been construed by the jury as an attack on defense counsel's personal integrity. The prosecution's remarks were likely interpreted as 'an admonition not to be misled by the defense interpretation of the evidence, rather than as a personal attack on defense counsel.' [Citation.]" (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1406.)

i. *Allegedly misstating the burden of proof.*

"[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements [citation]." (*People v. Marshall*, *supra*, 13 Cal.4th at p. 831.) Defendants contend the prosecutor did that here. We disagree.

Defendants rely principally on *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, which concluded: "The prosecutor's use of an easily recognizable iconic image [a puzzle coming together to form the Statue of Liberty] along with the suggestion of

a quantitative measure of reasonable doubt [by saying six out of eight puzzle pieces was sufficient to convict] combined to convey an impression of a lesser standard of proof than the constitutionally required standard of proof beyond a reasonable doubt." (*Id.* at p. 1268, fn. omitted.) But that is not what took place here.

The prosecutor here did not discuss reasonable doubt during the initial position of closing argument. Then defense counsel for Brown, citing Detective Duncan's acknowledgment that he did not know of any gang member who would provide 100 percent truthful information, argued: "[D]on't you need 100 percent truthful information? Don't you need that information to determine beyond a reasonable doubt that my client committed these crimes . . . ?" Defense counsel also apparently showed the jury a chart purporting to delineate levels of certainty less than reasonable doubt.

It was this chart that triggered the prosecutor's remarks to which defendants object: "And, finally, reasonable doubt. Mr. Higgins had that colorful chart. I think it is still up there. I have seen every form of that chart over the years. The purpose of the chart is to suggest to you that no case could ever be proved because they have all these levels with reasonable doubt at the top, all these levels to get there like it is impossible to prove. And I have seen it . . . as a sky scraper, I have seen it as a thermometer, I have seen it as a space shuttle with beyond reasonable doubt up in space. [¶] The best description of reasonable doubt that I have heard – and, of course, the jury instruction is the definition of it. But a person once said . . . if you believe it, then it's true. The case is proven if you believe it. If you believe it, then it's true."

After a defense objection was overruled by the trial court, the prosecutor continued: "It is not a mere possible doubt because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case that leaves you after you consider all of the evidence with an abiding conviction of the truth of the charge. That is what it means. [¶] The lawyers I think fairly talked about the fact it is not something that you think is true today but you might not think is true tomorrow. It is something that you think is true today and based on the evidence that you heard in

62

the trial you can say tomorrow, next week, next year, based on the evidence that I heard, [it's] true. Based on the evidence that you heard in this case, it's true."

Before talking about reasonable doubt, the prosecutor had told the jury: "Now, the judge has already instructed you on the law. The instructions are paramount. They prevail." Right before describing the concept of reasonable doubt as "if you believe it, then it's true," the prosecutor had said: "[T]he jury instruction is the definition of it." In addition, the trial court instructed jurors: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

After closing argument was done, defendants asked the trial court to instruct the jury that "the definition of reasonable doubt is not what you believe" because "[t]hat implies a standard of preponderance of the evidence." In denying the request, the trial court pointed out: "[B]oth sides in all cases and in particular in this case used rhetorical devices to explain the proof process. The jury has been instructed as to what the standard of proof is. All counsel referred to it. Ultimately the instructions will guide the jurors, and the court finds no misconduct from either side here."

The trial court did not err. The prosecutor's "if you believe it, it's true" statement was embedded within a discussion of the concept of "abiding conviction," and included an assertion that "the jury instruction is the definition of it." We do not think the jurors believed the prosecutor was saying each one of them had the right to make up their own definition of "truth beyond a reasonable doubt."

15. *Defendants were not entitled to voluntary manslaughter instructions.*

Defendants contend the trial court erred by not instructing the jury on voluntary manslaughter. This claim is meritless.

a. *Legal principles.*

A trial court must instruct on a lesser included offense if there is sufficient evidence to support a finding by the jury that the lesser offense was committed rather than the greater. (*People v. Breverman* (1998) 19 Cal.4th 142, 154-163.) That evidence

63

must be of some weight, however, because the existence of " 'any evidence, no matter how weak' " will not justify instructions on lesser offenses. (*Id.* at p. 162.)

"An intentional, unlawful homicide is 'upon a sudden quarrel or heat of passion' (§ 192(a)), and is thus voluntary manslaughter [citation], if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' [Citations.] ' "[N]o specific type of provocation [is] required . . . ." ' [Citation.] Moreover, the passion aroused need not be anger or rage, but can be any ' " '[v]iolent, intense, high-wrought or enthusiastic emotion' " ' [citation] *other than revenge* [citation]." (*People v. Breverman, supra,* 19 Cal.4th at p. 163, italics added.) "The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Lee* (1999) 20 Cal.4th 47, 59.)

Thus, "[t]he heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. As we explained long ago . . . 'this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1252-1253.)

64

b. *Discussion*.

On the night of the killings, Wheeler's neighbor heard him arguing with three or four people during a confrontation on Wheeler's driveway. The neighbor could not hear what was said. The neighbor then heard a gunshot, the sounds of someone running, and more gunshots. Based on this testimony that an argument occurred just before the shootings, Brown and McLeod asked the trial court to instruct the jury on voluntary manslaughter.[11] The trial court ruled there was no substantial evidence warranting the instruction.

The trial court did not err. There was no evidence to prove either component of voluntary manslaughter. The evidence showed only a brief argument, of unknown origin and substance, followed by the shooting of two unarmed men from behind. This evidence did not provide any basis for a reasonable jury to conclude the victims had done anything to provoke the defendants, that the defendants' reason had been obscured by strong passions, or that reasonable persons would have reacted similarly.

Moreover, the jury verdicts were inconsistent with a finding of voluntary manslaughter. "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions. [Citation.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 646.) If the jury convicted Brown and McLeod of premeditated and deliberate murder, a voluntary manslaughter verdict was ruled out. (See *People v. Wharton* (1991) 53 Cal.3d 522, 572 ["By finding defendant was guilty of first degree murder, the jury necessarily found defendant premeditated and deliberated the killing. This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion . . . and clearly demonstrates that defendant was not prejudiced by the failure to give his requested instruction."].) The same result is reached if the jury convicted Brown and McLeod of felony murder because

---

[11] Miller declined to join this request.

" 'predictable conduct by a resisting victim' is not the type of provocation that reduces a murder charge to voluntary manslaughter." (*People v.Thomas* (2012) 53 Cal.4th 771, 813.)

16. *There was no cumulative error*.

Defendants contend their convictions should be reversed on the ground of cumulative error. Because we have found no errors, this claim of cumulative error fails. (See *People v. Seaton* (2001) 26 Cal.4th 598, 639; *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

17. *Trial court properly denied Miller's request for re-appointment of counsel*.

Miller contends the trial court erred by refusing to re-appoint counsel for him after he initially exercised his right to self-representation when the verdicts were returned. This claim is meritless.

a. *Background*.

Miller represented himself at the preliminary hearing with Paul Cohen serving as standby counsel. After the preliminary hearing, Cohen was appointed to represent Miller and he served as Miller's counsel throughout the trial. On November 22, 2010, 10 days after Miller was convicted, the trial court granted his request under *Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525] to again represent himself for purposes of making a new trial motion and for sentencing.

On February 18, 2011, Miller asked the trial court to appoint Cohen as his cocounsel, which the court declined to do. Instead, the court offered to reappoint Cohen to represent Miller, an offer Miller declined. At the same hearing, the trial court denied Miller's motion to order a psychiatric evaluation. In response to Miller's claim he did not understand the nature of the charges against him, the trial court said it appeared Miller was perfectly competent, remarking: "Mr. Miller, you don't have to play that game with me. You have understood the entire proceedings throughout this whole trial."

66

On March 9, 2011, the trial court denied Miller's motion for a new trial and then sentenced him. That morning, the trial court had received a written motion Miller filed the previous day. This motion claimed Miller was incompetent, asked for counsel to be appointed on the ground he did not understand the proceedings, and challenged the validity of his convictions on various grounds. The trial court denied that motion too.

Miller now claims the trial court erred by denying his request for reappointment of counsel.

b. *Legal principles.*

A trial court has discretion to grant or deny a subsequent request to revoke a *Faretta* waiver and have counsel reappointed. "When a criminal defendant who has waived his right to counsel and elected to represent himself under *Faretta* . . . seeks, during trial, to revoke that waiver and have counsel appointed, the trial court must exercise its discretion under the totality of the circumstances, considering factors including the defendant's reasons for seeking to revoke the waiver, and the delay or disruption revocation is likely to cause the court, the jury, and other parties." (*People v. Lawrence* (2009) 46 Cal.4th 186, 188.) "[A] trial court should consider, along with any other relevant circumstances, '(1) defendant's prior history in the substitution of counsel and in the desire to change from self-representation to counsel-representation, (2) the reasons set forth for the request, (3) the length and stage of the trial proceedings, (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion, and (5) the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney.' [Citation.]" (*Id*. at p. 192.)

c. *Discussion.*

We conclude the trial court did not abuse its discretion by denying Miller's request to have counsel reappointed because the court reasonably concluded he was purposely trying to manipulate the proceedings.

The court indicated on February 18 that Miller was playing games when he claimed not to understand the charges against him and sought a psychiatric examination. At the March 9 hearing, the trial court recounted the history leading up to Miller's request that morning for reappointment of counsel, noting it had previously denied his post-verdict motion "that you are not competent for purposes of representing yourself and you have never been competent. We're not revisiting that motion again today."

At the February 18 hearing, Miller told the trial court: "I'm still confused about a lot of things. The nature of the cause against me. Nothing has come across my face to show me . . . what's happening, why am I being held liable." In response to Miller's request for a psychiatric examination, the trial court said: "There is no evidence of any incompetence on your part. In fact, there is a lot of evidence that you are competent." After the court told Miller he would be brought back on March 9 for sentencing, the following colloquy occurred:

"Defendant Miller: I have a question. I have a question. My question is according to my 6th Amendment right . . . I am to be told the nature of the cause. And so I'm asking the court is this . . . a criminal action?

"The Court: Mr. Miller, okay. Mr. Miller, you don't have to play that game with me. You have understood the entire proceedings throughout this whole trial. Throughout the entire trial you . . . have understood everything very clearly. So much so you raised more issues perhaps than your attorney did regarding the accusation, and the witnesses against you, and the nature of the proceedings. You understood them quite clearly."

Miller's handwritten motion asking for appointment of counsel, which the trial court reviewed prior to the March 9 hearing, demonstrates he was still playing games three weeks later. The motion begins by saying: "I have no understanding how to defend myself in a jurisdiction that does not lawfully exist." Miller then introduces a long, tax protester-like rant attacking the validity of the judicial system. He references "commercial transactions made under the 'Negotiable Instrument Law' as a result of the U.S. Bankruptcy as declared by President Roosevelt on March 9, 1933," and asserts that "today all our courts sit as non-constitutional-non-Article III Legislative tribunals"

68

He ends by asking the trial court to appoint "competent lawfully [*sic*] representation because although my interest is greatest I am incapacitated mentally to understand the measure of discretionary justice."

Then all of a sudden, at the March 9 hearing, Miller became extremely articulate and well-reasoned while orally raising a whole series of alleged trial errors, including ineffective assistance of counsel, prosecutorial misconduct, his inability to cross-examine one of his codefendants, judicial misconduct for showing prospective jurors the Bundy photograph, and juror misconduct. As an example, Miller argued there had been juror misconduct because of an inappropriate contact between a victim's family and the jury: "And I also feel by the . . . foreman . . . and one of the alternates talking to the victim's family outside the courtroom that the court should have asked what was the . . subject matter of that conversation. Because . . . juror No. 3, did end up being the foreman. And No. 2 did end up staying on the jury. By them talking to the victim's family outside in the hallway, we never know – we can't revisit those facts and what really transpired. So I feel like that terribly – it hurt me and prejudiced me."

We agree with the Attorney General that "Miller's actions in February and March, both in court and in his written filings, showed that he was attempting to manipulate the right to counsel for an improper purpose. The court was, therefore, under the totality of the circumstances, entitled to exercise its discretion and deny Miller's request to delay the case so he could have counsel reappointed to represent him."

18. *Sentencing errors and clerical errors in abstract of judgment must be corrected.*

As the Attorney General properly acknowledges, the trial court committed several sentencing errors and the abstracts of judgment appear to contain several clerical errors. We will order these mistakes corrected. An unauthorized sentence may be corrected at any time (see *People v. Gisbert* (2012) 205 Cal.App.4th 277, 282; *People v. Sanders* (2012) 55 Cal.4th 731, 743, fn. 13), and it is proper and important to correct clerical errors in abstracts of judgment (*People v. Mitchell* (2001) 26 Cal.4th 181, 185).

69

Each defendant was sentenced to two terms of life without possibility of parole (LWOP) to be served concurrently. The trial court erred by ordering Brown and McLeod to serve, in addition to their LWOP sentences, two consecutive 25-years-to-life terms for firearm-use enhancements (§ 12022.53, subd. (d)). Because their LWOP sentences were to be served concurrently, the firearm enhancements for those convictions must also be served concurrently, rather than consecutively. A defendant "cannot be punished for the enhancement separately from the underlying offense." (*People v. Smith* (1985) 163 Cal.App.3d 908, 914; see *People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1311 ["The personal gun-use enhancements to which [Mustafaa] admitted were not separate crimes and cannot stand alone. Each one is dependent upon and necessarily attached to its underlying felony. In separating the felony and its attendant enhancement by imposing a concurrent term for the felony conviction and a consecutive term for the enhancement the court fashioned Mustafaa's sentence in an unauthorized manner under the sentencing procedure."].)

The abstracts of judgment for McLeod and Brown should be corrected to clearly reflect that both the LWOP terms and the accompanying firearm enhancements are to be served concurrently.

As to Brown and McLeod, the trial court also erred by imposing $10,000 parole-revocation fines under section 1202.45. These fines were inapplicable because the defendants were not sentenced to any determinate terms. (See *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1181-1182 [it was error to impose parole-revocation fine on defendant sentenced to term of life without possibility of parole on one count and indeterminate term on second count]; cf. *People v. Brasure* (2008) 42 Cal.4th 1037, 1075 [it was not error to impose parole-revocation fine on capital defendant who was also sentenced to determinate prison term on other counts].)

As to Miller, his abstract of judgment does not reflect that the trial court ordered his two LWOP terms to be served concurrently.

## DISPOSITION

The judgments are affirmed as modified. The sentences for Brown and McLeod are hereby modified as follows: the parole-revocation fines are vacated, and the firearm use enhancements are ordered to be served concurrently to each other rather than consecutively. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation amended abstracts of judgment for all three defendants, reflecting these modifications and correcting the clerical errors noted *ante*.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

CROSKEY, J.

ALDRICH, J.

71